**F I L E D**
**United States Court of Appeals**
**Tenth Circuit**

**APR 5 1999**

**PATRICK FISHER**
**Clerk**

PUBLISH

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

v.

No. 97-2301

LONNIE RAY WISEMAN,

Defendant-Appellant.

**APPEAL FROM THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF NEW MEXICO**
**(D.C. No. CR-96-72-JC)**

Jacquelyn Robins, Albuquerque, New Mexico, for Defendant-Appellant.

Sam Winder, Assistant U.S. Attorney (John J. Kelly, United States Attorney, with him on the brief), Albuquerque, New Mexico, for Plaintiff-Appellee.

Before **MURPHY**, **HOLLOWAY** and **MAGILL**,[*] Circuit Judges.

**HOLLOWAY**, Circuit Judge.

---

[*]The Honorable Frank J. Magill, United States Circuit Judge for the Eighth Circuit, sitting by designation.

This is a direct appeal from convictions and a sentence in a criminal case. Our jurisdiction is conferred by 28 U.S.C. § 1291 and 18 U.S.C. § 3742. Defendant/appellant Lonnie Ray Wiseman was convicted by a jury on each count of an eight count indictment based on a series of robberies of grocery stores in New Mexico. Wiseman had been indicted jointly with Thomas Martin, with all counts alleged against each of them. The district judge ordered the cases severed for trial, after which Martin entered into a plea agreement. [1] Martin did not testify at Wiseman's trial, however. Defendant Wiseman was convicted and received, *inter alia*, a sentence of imprisonment overall of 595 months.

## I

The evidence at trial, including some statements from a confession by Wiseman, taken in the light most favorable to the jury's guilty verdicts on all counts, showed generally as follows: The series of crimes for which Wiseman was convicted began in Santa Fe, New Mexico, on September 22, 1995, when he and Martin robbed a grocery store, getting away with $4,000 or $5,000. [2] Two witnesses who were working in the Santa Fe store at the time of the robbery testified at trial: Sandy Zamora, the first employee approached in the store, and Angie Montoya, who assisted

---

[1]We have previously vacated the restitution order imposed on Martin. *United States v. Martin*, 145 F.3d 1347 (table), 1998 WL 292400 (10th Cir. 1998).

[2]The jury was not told that Wiseman and Martin had escaped from custody in Idaho and made their way to New Mexico just before beginning the series of grocery store robberies.

in putting money in a bag. Ms. Zamora described the first man who approached her as about five feet, six inches tall, with "dirty blond" hair, a thin build and a thin face. V R. at 32. She also saw a second man, taller and dark looking, but didn't see his face. *Id*. at 33. Ms. Montoya only saw one man, the one who had approached Zamora, and was only able to describe him as Anglo with hair that was "a dirty blond, almost a light brown." *Id*. at 41. Neither of these witnesses attempted to identify defendant Wiseman at trial.

The day after the Santa Fe robbery, a grocery store in Taos was robbed and about $6,000 or $7,000 was taken. Katherine Duran was working at the cash register when the manager yelled that he had been robbed. *Id*. at 54. Ms. Duran went out into the parking lot to see if she could see a car leaving. She saw two men walking to a maroon or reddish car. She saw "a blond guy and a Spanish guy." *Id*. at 50. The one who "looked like he was Hispanic" was "just a big guy" and was "taller than the other one." Ms. Duran realized that the shorter, fairer man was one she had noticed when he first entered the store. He had walked right past her. She testified that she was able to identify Wiseman at trial because when she first saw him, before the robbery, "I was checking out the blond guy, and that's how I knew it was him." *Id*. at 58-59. Ms. Duran had previously identified a photo of Wiseman from a photo array shown to her by officers about three months after the robbery.

Wiseman and Martin next robbed a grocery store in Carlsbad on October 8,

-3-

1995, getting away with $2,500 to $3,000. Merced Carrasco was a manager at the store and at about 10:30 p.m. was working at a cash register when a man came through to purchase a couple of items. A few minutes later the same man came back into the store and approached Carrasco. The man showed a pistol and said, "We are going to rob your store." They went to the service booth where the safe was kept, and Carrasco emptied all of the bills into a grocery bag. Carrasco also saw a second man, whom he described as Hispanic and an inch or two over six feet tall. The second man did not display a weapon. Carrasco identified defendant Wiseman as the robber who had first approached him and who had made a purchase from him just minutes before that. *Id.* at 75-80. Carrasco had also identified a picture of Wiseman from a photo array shown to him by an officer about two months after the robbery. *Id*. at 88.

On October 13, 1995, Wiseman and Martin robbed a grocery store in Alamogordo and made away with about $20,000. Larry Clark was an assistant manager at that store and was in the office at about 11:00 p.m. when a man came into the office. The man lifted his shirt to show a pistol in his waistband, which he clutched and shook. The man demanded all of the money. Two other people were in the office, and the three employees loaded the money into bags. During this process, Clark looked up and saw a man standing on the outside of the window to the service booth. This man placed a gun on the counter. The first man was Anglo, with brown-blond hair. The other man was Hispanic. Clark identified Wiseman at trial. He also

-4-

picked a photograph of Wiseman from the array shown to him by officers some weeks after the robbery. *Id*. 98-103. Clark was shown two pistols, Exhibits 3 and 4, which he said looked like the guns used in the robbery. *Id*. at 103-04. (Those pistols were later identified as two air pistols which were in the car in which Wiseman had been a passenger just before his arrest in Arkansas in late November 1995, as discussed below.)

The fifth robbery committed by the pair in New Mexico was in Silver City on November 7, 1995, where $3,000 or $4,000 was taken. Marty Martinez was an assistant manager at that store and was approached by a man with a gun who ordered him to open the safe. Martinez was not able to describe the man except to say that he was "light-complected" but with a "pretty good tan, like he worked outside," and had "light brownish" hair. He also saw a slight scar on his face. While the robbery was going on, Martinez looked around the store and saw a "dark and heavyset" man, who opened his coat to show that he was holding a gun. Martinez identified Exhibit 4 as being like the pistol carried by the first man. Martinez identified Exhibit 7 (later proved to have been a "Tec-9" which had been thrown from the car in which Wiseman was riding just before his arrest in Arkansas) as the type of gun the second man had shown during the robbery. VI R. at 215-19. Martinez said he would not be able to identify the robber if he were to see him again. He had not made an identification from the photo array he had been shown, either.

The sixth and final robbery charged occurred on November 15, 1995, in Clovis, with more than $5,000 being taken. William Bargman, a store manager, testified at trial that the robbery occurred at about 3:00 p.m. Bargman and two other employees were talking in an aisle when a man approached and asked if one of them was the manager. Bargman said that he was and shook hands with the man, asking what he could do for him. The man opened his jacket to show that he was carrying a gun and said, "This is a real gun, this is a real robbery." Bargman looked around to see another man who opened his jacket to show that he was carrying a gun. Bargman's description of the first man was "slight built, sandy brown hair, mustache." He estimated the man's height at five feet four inches. The second man was over six feet tall and over 250 pounds. Bargman identified Wiseman as the first of the two robbers and identified Exhibit 7 as the gun carried by the second man. V R. at 112-116. [3]

About two weeks after the last of these six robberies, Martin and Wiseman were approached by a state trooper in Arkansas as they were stopped at a service station or a convenience store. The two men fled from the trooper and a high speed chase ensued. During the chase, the authorities saw the suspects throw a duffle bag out of the car. When the bag was later recovered it was found to have cash and a

---

[3]As will be discussed below, after their arrests both Wiseman and Martin stated that they had used only air pistols in at least the first few robberies. Two air pistols which were recovered at the time of Wiseman's arrest were introduced in evidence at his trial and were described by witnesses as replicas which closely resembled actual firearms.

semi-automatic firearm of the kind known as a Tec-9. The pursued car finally ran off the road, at which time defendant was taken into custody, but only after he first had attempted to run back to the car and officers had fired at least three shots at him. VI R. at 209-13. Martin avoided capture at that time but was later arrested near Abilene, Texas. After Wiseman's arrest, two air pistols were recovered from the car in which he had been riding, which were introduced at trial and identified by some of the witnesses to the robberies, as we have noted.

After his arrest, Wiseman was treated briefly at a local hospital for the minor injuries he had sustained when the car went off the road, then taken to a local jail. The next day, beginning at about 11:30 a.m., he was questioned for several hours by members of the Arkansas State Police, the Fayetteville Police, and F.B.I. Special Agent Mark Jessie. At first, Wiseman claimed that his name was Leonardo Hirsch and denied any role in any robberies. He ultimately gave a detailed statement which included admissions to five of the six New Mexico robberies. At trial, Agent Jessie testified to the substance of Wiseman's statement, including the admissions that he and Martin had committed the robberies in Santa Fe, Taos, Carlsbad, Alamogordo, and Silver City. V R. at 131-35. [4] Jessie testified that at some point after the advice of rights form was signed by Wiseman, "[h]e proceeded to confess to the armed

---

[4]The record contains no explanation for the fact that Wiseman's confession does not include any reference to the Clovis robbery.

robberies of five grocery stores in New Mexico," *id*. at 131, his confession not mentioning the Clovis robbery, *id.* at 135.

The defense called four witnesses at trial, all of them law enforcement officers. Detective Byrd of the Alamogordo Police testified that he interviewed Larry Clark, manager of the store which was robbed in that city, shortly after the robbery. In that interview, Clark told Byrd that he had noticed a man, the same man who later robbed the store, whom he suspected might be a shoplifter. Clark had said that he followed the man to the liquor section of the store.

The defense then called Sergeant Trujillo of the Alamogordo police who had also participated in the investigation of the robbery there. Trujillo testified that he had collected a number of items which might have been handled by the robber and had them tested for fingerprints. No fingerprints of either Martin or Wiseman were identified from any of the items. Trujillo also testified that he had contacted other officers investigating other robberies, including Detective Wilkinson of Carlsbad, and shared information about robberies in Taos and Santa Fe. Trujillo also testified that he talked with an officer in Gallup about the arrest of a man there who was considered a possible suspect in the string of grocery store robberies. Trujillo also had contact with authorities in Silver City and Clovis.

Detective Crews of Fayetteville, Arkansas testified that he took photos of Wiseman, and that another photo was taken by another officer on December 1, 1995.

It was the photo taken by the other officer which was used in the photo array shown to witnesses of the robberies.

A further defense witness was Detective Dodd of the Arkansas State Police. Dodd testified that he had contact with Trujillo, Wilkinson, and Detective Gully of Clovis on November 30, 1995. Dodd was then present for some of the interrogation of Wiseman on November 30, including interrogation by Agent Jessie of the F.B.I. Testimony of Manny Trujillo, a Taos detective, taken earlier, was read to the jury. He said that Katherine Duran picked out photo 2 from the array; that he had not asked her whether she had seen any news coverage about any arrests, nor did she volunteer such information; and Trujillo's testimony was the same as to one other witness. VI R. 259-60.

In closing argument, defense counsel argued, *inter alia*, that the conditions of the interrogation suggested that Wiseman was "broken down" and merely repeated what the officers said, the officers having obtained the basic information on the robberies through their contacts with the New Mexico officers. Counsel argued that the "purported" confession included no details of the crimes other than what the interrogators already knew from talking with the New Mexico authorities.

The indictment against Wiseman and Martin charged six counts of robbery affecting interstate commerce in violation of the Hobbs Act, 18 U.S.C. § 1951(a), and two counts of using a firearm during a crime of violence, in violation of 18 U.S.C. §

924(c)(1). The indictment alleged that the Tec-9 weapon had been used in the last two robberies; no use of firearms was charged in the first four robberies.

## II

Wiseman contends that the district court erred in denying his motion to dismiss the indictment. In that motion Wiseman had contended, as he does on appeal, that the grand jury proceedings were tainted by prosecutorial misconduct. He alleged that the prosecutor had improperly "testified" as to the effect of the robberies on interstate commerce and had improperly relied on a ruling of the Chief Judge of the District of New Mexico in her attempt to meet the requirement that the robberies affected interstate commerce. The prosecutor had told the grand jurors that a grocery store may be owned by an out of state chain and might have investors from other states. Then she said that in a recent case the Chief Judge had held that a robbery of a single restaurant in Taos affected interstate commerce because the restaurant obtained supplies from out of state and many of its customers were tourists from other states.

Although it is not proper for a prosecutor to testify before the grand jury, we believe that the remarks at issue here merely indicated the kind of evidence which could support a finding of probable effect on commerce, in the course of the prosecutor's legitimate effort to explain to the grand jurors the somewhat arcane basis for federal jurisdiction under the Hobbs Act. After the prosecuting attorney's

-10-

introductory remarks, the grand jury heard testimony from an investigating agent that all of the stores in question obtained most of their supplies from sources outside New Mexico. We feel that the reference to the ruling of the Chief Judge was not prejudicial in light of the evidence presented.

Additionally, the defendant alleges prejudice from testimony regarding how he and Martin had spent some of the stolen money. During the testimony of agent Magill, the prosecutor asked whether Wiseman and Martin had indicated how they had spent the stolen money. The agent replied that the two had said they used the funds to live in hotels and motels, to buy crack cocaine and to go to strip clubs.

We are not convinced that this line of questioning was improper. The question had first been suggested by a grand juror and was repeated by the prosecutor when the witness did not initially respond directly to the question. The grand jury had heard evidence that Wiseman and Martin were charged with six robberies and had been told the approximate amount taken in each instance. The amount of money recovered when Wiseman and Martin were apprehended was much less than the total they had stolen in the series of robberies. Thus, we think the question was within the broad range of relevance at this stage of the proceeding as having a bearing on the totality of the circumstances regarding the crimes charged and the supporting evidence.

We conclude that no error has been shown. Moreover, even if we were of the view that there had been some misconduct by the prosecutor in the grand jury

proceedings, we are convinced that we could provide no relief to defendant on review of his conviction. Defendant argues that the indictment should have been dismissed because the prosecutorial misconduct prejudiced him by influencing the decision to indict. Defendant relies on *Bank of Nova Scotia v. United States*, 487 U.S. 250 (1988), but his reliance is misplaced because the question whether the decision to indict was affected is not the focus of our review after a verdict of guilty has been rendered at trial. In considering whether an indictment should have been dismissed on grounds of prosecutorial misconduct before the grand jury, we first

> must determine whether the claimed errors should be characterized as technical or procedural and affecting only the probable cause charging decision by the grand jury, or whether the alleged errors should be characterized as threatening the defendant's right to fundamental fairness in the criminal process. If the errors can be characterized as procedural violations affecting only the probable cause charging decision by the grand jury, ***then the defendant must have successfully challenged the indictment before the petit jury rendered a guilty verdict.***

*United States v. Kilpatrick*, 821 F.2d 1456, 1466 (10th Cir. 1987) (emphasis added), *aff'd sub nom. Bank of Nova Scotia v. United States*, 487 U.S. 250 (1988). When, as here, the defendant has been convicted,

> the petit jury's subsequent guilty verdict means not only that there was probable cause to believe that the defendants were guilty as charged, but also that they are in fact guilty as charged beyond a reasonable doubt. Measured by the petit jury's verdict, then, any error in the grand jury proceeding connected with the charging decision was harmless beyond a reasonable doubt.

*United States v. Mechanik*, 475 U.S. 66, 70 (1986).

-12-

As the quoted passage from our *Kilpatrick* opinion recognizes, there are some cases in which errors occurring in the grand jury proceedings are deemed "fundamental."

> These cases may be explained as isolated exceptions to the harmless-error rule. We think, however, that an alternative and more clear explanation is that these cases are ones in which the structural protections of the grand jury have been so compromised as to render the proceedings fundamentally unfair, allowing the presumption of prejudice.

*Bank of Nova Scotia*, 487 U.S. at 256-57; *see also United States v. Lopez-Gutierrez*, 83 F.3d 1235 at 1245 (10th Cir. 1996).

We think it clear that the errors complained of here (assuming that there were errors at all) are instead "technical errors which, at most, could have affected only the grand jury's determination of probable cause." *Lopez-Gutierrez*, 83 F.3d at 1245. Because the petit jury convicted on all counts and, as explained below, because the trial evidence was sufficient to support the verdicts, the question whether there was probable cause for the indictment is moot.

### III

Wiseman asserts that his confession should have been suppressed. Within this argument, defendant attacks several rulings by the district court. Defendant first raised this issue by means of a motion to suppress, filed by the attorney first appointed to represent him. That attorney was later permitted to withdraw and present

counsel was appointed in his stead. Counsel then filed a motion to re-open the hearing and to reconsider the motion to suppress. Counsel also filed a motion *in limine* to prohibit introduction of the defendant's statements. Wiseman now contends that the district court's adverse rulings on all of these motions were erroneous.

We first consider defendant's argument that he did not voluntarily waive his rights to remain silent and to consultation with an attorney before making the statements at issue. Defendant testified at the suppression hearing that he was exhausted during the interview and that the officers had to keep waking him up after each question. He said that he had not slept since his arrest and had slept only about three hours all together in the three or four days before his arrest. Wiseman testified that he was still under the effects of crack cocaine that he had smoked only minutes before the car chase began. He also testified that he asked for an attorney when it became clear to him that the officers did not believe that he was Leonardo Hirsh and that he said he did not want to be questioned any more at that time. When shown two waiver of rights forms which the officers had testified that he had signed during the interrogation, Wiseman said that he did not remember signing in his own name and that the signatures, while similar to his, did not look quite right.

The ultimate question of the voluntariness of a confession is one of law, to be reviewed de novo, but the district court's underlying findings of fact must be accepted unless they are clearly erroneous. *United States v. Hernandez*, 93 F.3d 1493, 1501

-14-

(10th Cir. 1996); *United States v. Short*, 947 F.2d 1445, 1449 (10th Cir. 1991). Here, the district judge expressly found that defendant's testimony was not credible and that the agents' testimony was credible. The government's evidence at the suppression hearing, from F.B.I. Agent Jessie and others, was to the effect that no threats or promises were made; that defendant Wiseman spoke articulately; and that there was no indication that he was impaired by his recent drug use or by injuries sustained when the car ran off the road just prior to his apprehension. Agent Jessie did testify that Wiseman was visibly tired and repeatedly fell asleep during the last hour of questioning. Jessie asked Wiseman whether he wanted to discontinue the interview, but Wiseman said he wanted to complete the interview. II R. at 21-22. [5]

There was conflicting testimony about when Wiseman was read his *Miranda* rights. At one point Agent Jessie said that prior to interviewing Wiseman, "[W]e read him his *Miranda* rights." II R. at 16. However, the judge noted that respecting the interview that started at 11:30 a.m. on November 30, 1995, which Arkansas Police Officer Dodd and Jessie took part in, Jessie's report said, "1:54 Mirandized by Officer

---

[5]In his reply brief, counsel for Wiseman raises the suggestion that he was beaten during the interrogation. We are asked to draw this inference from the fact that a photograph of defendant taken after the interrogation shows dark circles under his eyes, while photos taken earlier do not. Defendant did not testify that he had been beaten, and no evidence has been alluded to which would tend to show that the dark circles were in fact from a beating (much less that the beating was at the hands of the authorities), as opposed to from some other cause such as fatigue and the after effects of Wiseman's admitted use of crack cocaine.

-15-

Dodd," *id*. at 41; elsewhere Jessie said the waiver was signed "[w]ithin a few moments" after the 11:30 commencement of the interview, *id.* at 28, while again the Arkansas form said it was signed at 1:54, and Jessie said this was some hour and a half after commencement of the interview. *Id.*

The judge made oral findings at the conclusion of the suppression hearing. II R. 108 *et seq.* He said the motion turned on whom he believed "and I believe the F.B.I. agents." He found that both defendants signed waivers and there was no coercion in their signing; they were not interrogated "all that long," and the judge believed the agents as to the defendants' condition when interviewed. There was no showing of guns or use of force. Both had been Mirandized and both freely gave statements. The motions to suppress were denied. *Id*. at 109. Clearly, the issue of voluntariness turns on the factual inquiry. The district court's findings are supported by the evidence presented and are based on credibility determinations. We cannot say that these findings are clearly erroneous. *See Anderson v. City of Bessemer City,* 470 U.S. 564, 575-76 (1985) (great deference due to credibility determinations). Accordingly, we see no error in the denial of the motion to suppress the defendant's statements.

Wiseman also argues that the district court abused its discretion in denying the motion to re-open the suppression hearing and reconsider the ruling on that issue. The motion was filed in the district court after substitution of counsel and, for the

most part, was based on the contention that defendant had received ineffective assistance of counsel at the time of the suppression hearing. This ineffectiveness of counsel argument is also urged on appeal.

We will not consider this argument. Ineffective assistance of counsel claims should be brought in collateral proceedings, not on direct appeal. *United States v. Galloway*, 56 F.3d 1239 (10th Cir. 1995). Among the reasons for our holding in *Galloway*, we noted that by postponing consideration of ineffective assistance claims to collateral review, "at the very least counsel accused of deficient performance can explain their reasoning and actions, and the district court can render its opinion on the merits of the claim." 56 F.3d at 1240. We also noted the importance of having the district court, with its familiarity with counsel's performance, consider ineffective assistance claims in the first instance. *Id*. We see no reason to depart from our general rule as laid down in *Galloway* and decline to consider this argument.

As for the district court's ruling denying the motion to re-open the suppression hearing or to reconsider the order denying the motion to suppress defendant's post-arrest statements, we see no abuse of discretion. The district court was under no obligation to afford the relief requested, having already conducted an evidentiary hearing before denying defendant's suppression motion. Nor did the trial judge abuse his discretion in declining to postpone the trial so that he could conduct an evidentiary hearing on the claim that defendant's first counsel had afforded

ineffective representation in the suppression hearing. Without considering whether there might be a rare case in which extraordinary circumstances would require a district judge to adopt such a course, we certainly do not think that the ineffective assistance claim presented to the district court in this case raised such grave doubt about the fairness of the proceedings that an abuse of the trial judge's discretion has been shown.

## IV

Defendant contends that the district court erred in denying his motion to exclude evidence of identifications, both those made at trial and those made out of court, by several witnesses who were shown a photo lineup, consisting of photos of defendant and five other young men. Defendant contends that the photo array was impermissibly suggestive and that the resulting identifications of him by the witnesses were so tainted by the improperly suggestive features of the photo array that admission of this testimony at trial violated his due process rights.

The constitutional question whether a photo array was impermissibly suggestive invokes the inquiry we staked out in *United States v. Sanchez*, 24 F.3d 1259, 1261-62 (10th Cir. 1994):

> When the constitutionality of a photo array is challenged, the due process clause requires a two-pronged inquiry: first, the court must determine whether the photo array was impermissibly suggestive, and if it is found to be so, then the court must decide whether the

identifications were nevertheless reliable in view of the totality of the circumstances . . . . While we must review the district court's underlying factual findings, if any were made, under the clearly erroneous standard, . . . the ultimate question of whether trial and pretrial identification evidence infringed due process rights is reviewed de novo. *Grubbs v. Hannigan*, 982 F.2d 1483, 1489 n. 5 (10th Cir. 1993).

*See also Manson v. Brathwaite*, 432 U.S. 98, 114 (1977).

In the first stage of our analysis, a number of factors may be relevant in determining whether the array was improperly suggestive. These include "the size of the array, the manner of its presentation by the officers, and the details of the photographs themselves." *United States v. Sanchez*, 24 F.3d at 1262. The district court held an evidentiary hearing on defendant's objections to the identifications and his related motion *in limine.* Four law enforcement officers testified for the government. The evidence was that at least three photographs were taken of defendant shortly after his arrest in Arkansas. One of these was forwarded to Officer Wilkinson in Carlsbad. Wilkinson put together the photo array at issue here. He testified that he used a system in which the suspect's photograph is classified according to several characteristics, such as shape of the face, age, height, race and hair color. This classification scheme is used, and was used by Wilkinson in this case, to select photographs of other individuals who are generally similar in appearance to the suspect. Wilkinson made copies of all of the photographs and assembled a number of identical photo arrays, which he then gave to the F.B.I..

-19-

Copies were then distributed to the officers in each of the other cities where the robberies had occurred. Witnesses to the robberies in each city were shown the array by a local officer.

The record does not reveal why the Arkansas authorities chose the particular photo of defendant to send to the authorities in New Mexico, but the choice was unfortunate. The photo used in the array shows defendant with very prominent dark circles under his eyes and with an extremely unnatural, chalk-white pallor, while the skin tones in the photos of the other five persons in the array look quite natural. The overall effect is that the picture of the defendant stands out prominently from the others in the array, and undoubtedly the viewer's attention would be aroused by it. Two witnesses stated that the defendant looked "rougher" in the photo than they remembered him at the time of the robberies. III R. 45; V R. 103. Additionally, in all of the photos in the array except Wiseman's, a thin chain is visible around the subject's neck. Testimony at the hearing on defendant's motion to suppress indicated that these were "mug shots." Presumably the chains held signs with identifying information, but only the chains are visible in the photos as used in the array. We think an ordinary observer in the context of a photo lineup would attach significance to the chains.

The suggestive effect created by the sharp contrast between the appearance of defendant's picture and those of the others in the array is not diluted in this case by

the use of a substantial number of photos. Instead, as we have noted previously, using as few as six photos in an array, while not *per se* a due process violation, is a factor affecting the weight we give to the irregularities in the array. *Sanchez*, 24 F.3d at 1262. As we explained in *Sanchez*,

> when a relatively low number of photographs are used in an array, minor differences such as background color can make a picture stand out, and can act to repeatedly draw a witness's eyes to that picture. Common sense dictates that slight irregularities are more likely to "jump out" at a witness reviewing a single sheet of paper with only six photographs on it than at a witness reviewing a large mug book containing hundreds of photographs. Upon continued inspection, the witness may begin to believe that the "oddball" picture was taken under different circumstances than the others. This fact can suggest a number of things to the witness, the most dangerous of which is that the similar pictures were taken together to form a pool or control group, and that the one picture that stands out is the suspect. . . . . The lower the number of photographs used by officers in a photo array, the closer the array must be scrutinized for suggestive irregularities.

24 F.3d at 1262-63.

Here the low number of photos in the array cannot dilute the "suggestive irregularities" of the array. The defendant's picture stands out prominently from the others. Even the relatively minor detail of the chains around the necks of the others, which at first blush might seem favorable to the defendant, may compound the problem because, as noted in *Sanchez*, the likely inference that Wiseman's picture was taken under different circumstances may suggest that the other photos were assembled to provide a pool or control group, as indeed they were. Moreover, the presentation of the photo array to the witnesses was somewhat flawed. Comments made to the

-21-

witnesses by the officers who displayed the photo array cut both ways. Some witnesses were told that the perpetrator of the robberies might not be in the array. On the other hand, some of the witnesses were told that a suspect had been arrested.[6] We have previously noted that imparting this information is highly suggestive. *Grubbs*, 982 F.2d at 1490.

Considering all of the relevant factors – of which we believe the most significant in this case is the way defendant's photo stands out from the others in the array – we conclude that the photo array itself was unduly suggestive. We must hold that the district court's finding of fact to the contrary, III R. at 59 ("I don't find the photo array to be unduly suggestive . . . ."), is clearly erroneous.

We move to the next phase of the analysis, focusing on whether the identifications by the witnesses were reliable in spite of the "corrupting influence" of the suggestive circumstances. To inform our determination as to the reliability of the identifications, we examine factors identified by the Supreme Court:

> [T]he factors to be considered in evaluating the likelihood of misidentification include the opportunity of the witness to view the criminal at the time of the crime, the witness' degree of attention, the accuracy of the witness' prior description of the criminal, the level of certainty demonstrated by the witness at the confrontation, and the

---

[6]Several of the officers gave the witnesses a printed form to read before presenting the array. This form contained several instructions and cautions, including that the suspect's photo might not be in the array. However, at least one officer told two witnesses that the authorities believed they had the perpetrators in custody.

length of time between the crime and the confrontation.

*Neil v. Biggers*, 409 U.S. 188, 199-200 (1972).

Generally most of the witnesses, if not all, viewed the robbers, and especially the shorter, fairer man whom they later identified as Wiseman, under favorable conditions. The stores were well lighted, the face was not covered, and the encounters observed by most of the witnesses lasted at least several minutes as cash was being collected and put into bags. Although defense counsel at trial argued that the witnesses were in such great fear that their degree of attention was greatly reduced, the record does not support this assertion as to the witnesses who did identify the defendant. Indeed, at three of the locations a witness had noticed defendant before he had shown his weapon and demanded money. An employee of the Taos store had noticed Wiseman when he first entered, before she had reason to think anything amiss. V R. 58-60. The manager at the Alamogordo store had been keeping an eye on Wiseman, before Wiseman approached him and began the robbery, because he thought Wiseman might be a shoplifter. *Id*. at 105-08. At the Carlsbad store, Wiseman had entered and made a small purchase, which was handled by the manager, before returning to the store minutes later and approaching the manager for the robbery. *Id*. at 75-76. In short, we believe that the record supports the conclusions that the opportunities of the witnesses to view the perpetrator at the time of the robberies and the witnesses' degree of attention should weigh in favor of the

-23-

reliability of their identifications.

The third of the factors noted in *Neal v. Biggers* is the accuracy of the witnesses' prior descriptions of the perpetrator. The record indicates that the witnesses' descriptions were fairly accurate, if not especially detailed. Defendant makes little argument on this facet of the analysis, and we conclude that this factor suggests that the identifications were reliable.

The fourth of the *Biggers* factors is the level of certainty demonstrated by the witness at the confrontation. At this point it is appropriate to note that we have been considering the witnesses as a group, rather than individually, because the defendant makes a broad brush attack on all of the identifications in general terms. We should not be understood as suggesting that this approach is always proper in a case with several witnesses, and it is obviously ill suited in evaluating this fourth factor in the instant case since naturally the witnesses expressed varying degrees of certainty at the time that they selected defendant's photo from the array. Also, the time that a witness took to make his or her selection varied from a few seconds to several minutes. Of course with respect to those witnesses who indicated some uncertainty, that fact was brought out both at the suppression hearing and at trial.[7] On balance, we must conclude that this factor weighs in the government's favor on some witnesses and

_____

[7]Some of the witnesses made no identification from the photo array, a factor that the district judge relied on to support his finding that the array was not unduly suggestive.

-24-

very slightly in the defendant's favor as to others.

Finally, the time between the crimes and the presentation of the photo arrays varied from about three weeks to almost three months. Three months is not an extremely long time however, and we conclude that this factor weighs in favor of the reliability of the identifications, but only slightly so. *See Archuleta v. Kerby*, 864 F.2d 709, 712 (10th Cir. 1989) (collecting cases, including cases where time intervals of several months were found not to be so long as to cast doubt on the reliability of the identifications).

On the whole, we conclude that the pretrial identifications were not so impermissibly tainted by the suggestiveness of the photo array and the circumstances of its presentation that use of the identification evidence infringed on due process rights. "Even if an identification procedure is suggestive, the introduction of the identification evidence does not necessarily violate a defendant's due process rights." *Archuleta v. Kerby*, 864 F.2d at 711. Accordingly, we hold that defendant's due process rights were not infringed by the admission of testimony concerning the pretrial identifications at trial.

As to the identifications by the witnesses at trial, defendant argues that the suggestiveness of the pretrial identifications tainted the in-court identifications. Because we have held that the pretrial identification procedures were not so suggestive as to undermine the reliability of the identifications, we must reject the

attack on the trial identifications here; in view of the conclusions we have stated, the suggestiveness in the courtroom identification procedure was a matter for the jury in weighing the witness's testimony. *See Romero v. Tansy*, 46 F.3d 1024, 1032 (10th Cir. 1995). [8]

We hold that there was no error in the admission of the identification testimony.

## V

Wiseman contends that the district court abused its discretion in denying his motion to sever Counts 3 and 4 from the other counts. We agree that the decision whether to sever counts of an indictment for separate trial is a matter committed to the sound discretion of the trial court. *E.g., United States v. Cox*, 934 F.2d 1114, 1119 (10th Cir. 1991). Moreover, this is an area in which the trial judge's discretion is very broad. Thus, we will not reverse absent a strong showing of prejudice, which means that "[d]efendant's burden to show an abuse of discretion is a difficult one." *Id*. We conclude that this burden has not been met here.

---

[8]As to the robbery in Clovis, the one witness, Bargman, who testified at trial had not made an identification earlier from the photo array because he was not completely sure that he could identify the suspect at that time. V R. 121-22. Thus, we can see no prejudice from the fact that the array was presented earlier to this witness. At trial, Bargman identified Wiseman in court and said that he was "[a] hundred per cent" sure that he was the robber. *Id*. at 124.

Wiseman argues that the government's evidence was strongest on Counts 3 and 4 and that this created an intolerable risk that the jury would be swayed to convict also on the "weaker" counts. Defendant specifically asserts that the evidence was "exceptionally weak" as to counts 1, 2, 5, and 6, and refers to the section of his brief in which he challenges the sufficiency of the evidence to support all of the counts as support for this assertion. We address the sufficiency of the evidence arguments in part VI, *infra*, in which we conclude that the evidence was sufficient as to all eight counts. In the section of his brief addressing the sufficiency of the evidence, defendant again singles out counts 1, 2, 5, and 6 for specific attention, asserting that the primary shortcoming in the proof on those counts was the lack of any identification of defendant as the perpetrator. We take it that this is the thrust of defendant's argument as to the alleged need for severance. To make this assertion, defendant must be assuming, incorrectly, that we will have agreed with his contention that his inculpatory statements should have been suppressed. Even then, the assertion is inaccurate because as to count 2 there was evidence other than the confession to identify defendant as one of the robbers. In any event, as we discuss in part VI-A, *infra*, we believe that there was sufficient evidence to corroborate the defendant's confession and to support the convictions on all counts.

"[T]hat the government's evidence was stronger on some counts than on others does not mandate severance under Rule 14." *Cox*, 934 F.2d at 1120. On our review

of the record, we do not find that the strength of the government's evidence was so substantially greater on Counts 3 and 4 that prejudice is shown. We find no abuse of discretion in the denial of the motion to sever those two counts.

## VI

Wiseman next argues that the evidence was insufficient to support the jury verdict and that his trial and post-trial motions for judgment of acquittal should therefore have been granted. His attack on the sufficiency of the evidence has several prongs.

## A

Mr. Wiseman first contends that there was insufficient evidence to corroborate his confession. However, the confession covered only five of the six robberies; we will separately consider the sufficiency of the evidence as to the sixth robbery and the firearms charge based on that robbery (Counts 7 and 8 of the indictment), *infra*. We review the sufficiency of the evidence *de novo*. *United States v. McDermott*, 64 F.3d 1448, 1457 (10th Cir. 1995). A reviewing court does not re-weigh the evidence, nor does it

> "ask itself whether *it* believes that the evidence at the trial established guilt beyond a reasonable doubt." Instead, the relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.

*Jackson v. Virginia*, 443 U.S. 307, 318-19 (1979) (quoting *Woodby v. I.N.S.*, 385 U.S. 276, 282 (1966)).

We note at the outset that it is not necessary for the corroborating evidence to establish independently each element of the crime. Instead, the prosecution is required to produce

> substantial independent evidence which would tend to establish the trustworthiness of the statement. . . . . . It is sufficient if the corroboration supports the essential facts admitted sufficiently to justify a jury inference of their truth. Those facts plus the other evidence besides the admission must, of course, be sufficient to find guilt beyond a reasonable doubt.

*Opper v. United States*, 348 U.S. 84, 93 (1954). *See also Smith v. United States*, 348 U.S. 147, 156 (1954); *United States v. Chimal,* 976 F.2d 608, 610-11 (10th Cir. 1992); *United States v. Shunk*, 881 F.2d 917, 918-20 (10th Cir. 1989) (per curiam). *Opper* rejected a view which had earlier been the rule in many jurisdictions and was deeply rooted in the common law that independent evidence was required to corroborate the *corpus delicti*. *See Shunk*, 881 F.2d at 918-20 (discussing concept of *corpus delicti* and holdings in *Opper* and *Smith*, *inter alia*). In the instant case, we think the corroboration was sufficient that even the older *corpus delicti* rule, were it applicable, would be satisfied.

With regard to the Santa Fe, Carlsbad, Alamogordo, and Silver City robberies, witnesses who were present at the scene of each crime described the commission of the crime and gave generally consistent, if not very detailed, descriptions of the

perpetrators. The method used in the robberies, as described by the witnesses, is consistent with defendant's confession. And, in the Carlsbad and Alamogordo robberies, there was at least a tentative identification of Wiseman as one of the two perpetrators. We certainly cannot find the evidence insufficient to corroborate Wiseman's confession as to those two robberies.

As to the Santa Fe robbery, the two store employees who testified were not asked to identify Wiseman; presumably the witnesses had told the prosecuting attorney that they could not confidently do so. The sole witness to the Silver City robbery said that he could not make an identification. Nevertheless, we think the corroborating evidence was sufficient as to those counts as well. When independent evidence shows that a crime was committed, no further corroboration is necessary; the identification of the defendant as the perpetrator may be based solely on his confession. *United States v. Treas-Wilson*, 3 F.3d 1406, 1409 (10th Cir. 1993).

Unlike the other robberies, the government produced no witness who actually was approached by Wiseman at the Taos grocery store and gave money over to him. However, Katherine Duran testified that she was working one of the sales registers at the store that day when she heard the manager yell out that he was just robbed. V R. 54.[9] Ms. Duran said that she went out into the parking lot and saw two men

---

[9]Defendant did not object to the manager's statement, which Ms. Duran related, that he had just been robbed, and an objection would have been without

(continued...)

-30-

getting into a maroon colored car. She identified defendant as one of those two men. She had noticed Wiseman when he first came in the store; he passed very close to her, and she was "checking him out." V R. 58-60. This evidence is certainly adequate corroboration of defendant's confession to that crime.

Mr. Martinez was the only witness called to testify to the commission of the robbery at Silver City. He described a robbery which generally fit the pattern of the other robberies. A man with light brown hair approached him when he was in the store office, brandished what appeared to be a firearm (which Martinez identified at trial as one of the air pistols recovered from the vehicle Martin and Wiseman abandoned at the time of Wiseman's arrest), and demanded that Martinez open the safe. VI R. at 215-17. During the encounter, Martinez looked around the store and spotted a second man, larger and darker than the first, who opened his coat to reveal a gun that he was carrying. *Id*. at 217-18. The description of the second man, while not very specific, generally matches the descriptions of Martin given by other witnesses. *Id*. ("dark and heavyset"). Martinez identified the Tec-9 which was recovered after the car chase in Arkansas as the weapon the second man had displayed during the robbery. We conclude that this evidence was sufficient to corroborate defendant's confession to this crime.

---

[9](...continued)
merit. The statement would have been admissible as an excited utterance. Fed. R. Evid. 803(2).

-31-

The defendant's confession did not include any information about the Clovis robbery. Although defendant does not specifically attack the sufficiency of the evidence that he participated in a robbery there, we have examined the record and found the evidence sufficient to support his conviction on that robbery charge. Mr. William Bargman was the store manager who was approached by Wiseman, and at trial he positively identified Wiseman. V R. 112-15. Other details that he gave of the robbery showed that the robbers followed the same general method they had used in the previous five robberies.

In sum, we find that sufficient evidence corroborated the defendant's confession as to his participation in five robberies[10] and that his commission of the sixth robbery was also established by sufficient evidence. Defendant raises two other arguments attacking the sufficiency of the evidence. We must determine whether the requisite connection to interstate commerce was proven to support the robbery convictions under the Hobbs Act, and we must examine the evidence regarding the use of a firearm in the Silver City and Clovis robberies.

---

[10]Defendant also attempts to cast doubt on the "trustworthiness" of his confession, suggesting the fact that the Arkansas authorities had been informed of the New Mexico robberies as a basis, it seems, for the inference that the interrogators supplied all of the content of the confession. This is nothing but an attack on the credibility of the government's witnesses. We defer to the district judge's resolution of credibility issues and his specific findings thereon, made at the hearing on the defendant's motion to suppress his confession. Seeing nothing else to this facet of defendant's argument, we reject it.

**B**

In reviewing the evidence on the six robbery counts thus far, we have omitted the element which distinguishes violations of the Hobbs Act from common law robbery and provides the basis for federal jurisdiction in this case – the requirement that the robberies have some nexus with interstate commerce. The Hobbs Act provides for the punishment of anyone who " *in any way or degree* obstructs, delays, or affects commerce or the movement of any article or commodity in commerce, by robbery or extortion or attempts or conspires so to do . . . ." 18 U.S.C. § 1951(a) (emphasis added). This language shows the intent to "use all the constitutional power Congress has" to protect interstate commerce. *Stirone v. United States*, 361 U.S. 212, 215 (1960). Consistent with that legislative intent, we have held that only a *de minimis* effect on commerce must be shown. *E.g., United States v. Bolton*, 68 F.3d 396, 398-99 (10 th Cir. 1995).

Defendant's argument that the evidence was insufficient to establish the interstate commerce element necessary for the Hobbs Act convictions is a narrow one. He concedes that only a *de minimis* effect need be proven and acknowledges our holding that this minimal effect can be established by evidence that the stolen money would have been used to purchase items in interstate commerce, a concept known as the "depletion of assets theory." *Bolton*, 68 F.3d at 398. His contention is that the evidence as to all but the first robbery count (the Santa Fe robbery) was insufficient

-33-

to meet even this low standard because the witnesses were not asked specifically whether the stolen money would in fact have been used to purchase goods from interstate sources, as the witnesses in *Bolton* apparently were.

As to each of the other five robberies, a manager or other knowledgeable store employee testified that: the store carried tens of thousands of items; the wholesalers from whom the store purchased its goods provided goods originating in several other states; and generally that sales revenues were used to pay employees, to pay for utility services and other items of overhead, and to purchase more goods to replenish stocks. Defendant contends that this evidence was insufficient because the witnesses were never asked if the stolen revenues *would* have been used to purchase more goods in interstate commerce. This contention thus raises a legal question, which we review *de novo*, regarding the evidence necessary to satisfy the interstate commerce element of the Hobbs Act.

We hold that the evidence was sufficient. In the instant case, as to each robbery count, the government introduced evidence that the store in question purchased substantial amounts of goods in interstate commerce for resale, and that sales revenues were used in part to replenish those supplies. We note that the amounts taken in these robberies, ranging from $2,500 to $20,000, were significant. *See United States v. Zeigler*, 19 F.3d 486, 491 (10th Cir. 1994) (amounts ranging from $160 to $1500 not "so trivial as to automatically place these robberies beyond the

reach of the [Hobbs] Act"). On this evidence, a properly instructed jury could have inferred that the stolen money could have been used to purchase additional goods in commerce. *Zeigler*, 19 F.3d at 493 ("A jury may infer that interstate commerce was affected to some minimal degree from a showing that the business assets were depleted.").

Wiseman contends, however, that this jury was not properly instructed. His argument on this point, which is closely related to his argument on the sufficiency of the evidence, is that the jury should have been instructed that the government had to prove that the stolen money *would* have been used to purchase more goods in interstate commerce. Instead of that, the jury here was told that the government could meet its burden of proof by showing that the stolen money *could* have been used to purchase additional goods in interstate commerce.

The instructions informed the jury that the Hobbs Act counts required proof of three elements: first, the taking of property from another against that person's will; second, the use of actual or threatened force, violence, or fear of injury; and third, that the conduct "obstructed, delayed, interfered [with] or affected interstate commerce." The problem, defendant contends, is in the following instruction, which explained for the jurors the meaning of the interstate commerce element. Instruction 8E included the following:

> If the government proves beyond a reasonable doubt that these
> businesses purchased goods or services that come from outside the State

of New Mexico and that, therefore, all or part of the money allegedly stolen from these businesses because of the alleged robbery *could* have been used to obtain such foods or services from outside the State of New Mexico, then you are instructed that you may find that the defendant "obstructed, delayed or affected commerce" as that term is used in these instructions.

It is not necessary for the government to prove that the defendant actually intended to obstruct, delay, or affect commerce. The government must prove beyond a reasonable doubt, however, that the defendant deliberately performed an act, the ordinary and natural consequences of which would be to obstruct, delay, or affect commerce, ***and that commerce was, in fact, obstructed, delayed or affected.***

I R. at Tab 145 (Instruction 8E) (emphasis added).

Because only a *de minimis* effect on commerce is required and the final words of the instruction require the jury to find that commerce was affected, it could be argued that the instruction is perfectly sound. We cannot overlook, however, the fact that the jurors were specifically told that they could find that commerce had been affected if they found that the stolen money *could* have been used to purchase additional goods in commerce. And, if this standard is legally incorrect, we do not think that other language elsewhere in the instructions could cure this defect. "Where two instructions are given which are in direct conflict with each other, one of which is error and might have been followed by the jury, the giving of such instructions is generally said to be prejudicial." *Gonzales v. United States*, 286 F.2d 118, 122 (10th Cir. 1960); *accord, United States v. DeMasi*, 40 F.3d 1306, 1319 (1st Cir. 1994). Thus, the fact that one part of the instruction required the jury to find that commerce "was in fact" affected will not remove the prejudice if the previous language – telling the

-36-

jury that it could find that commerce had been affected if the stolen money *could* have been used to purchase additional goods in commerce – was legally flawed.

This issue thus turns on the highly specific question whether the jury should have been told that the evidence had to demonstrate that the stolen money **would** have been used to purchase more goods and services in interstate commerce, or whether it was correct to instruct the jury that it would be sufficient if the stolen money **could** have been used to purchase additional goods and services in commerce.[11] The simple answer to the dispositive question is that the instruction was not prejudicial because only a potential effect on commerce is required to satisfy the interstate commerce element. *United States v. Nguyen*, 155 F.3d 1219, 1228 (10th Cir. 1998), *cert. denied,* 119 S.Ct. 1086 (1999). Therefore, the instruction challenged by Wiseman was not prejudicial, and the evidence was sufficient to support the jury's verdict on each count.[12]

---

[11]To a layperson, this acute focus might appear to be trivial, but it most certainly is not. "The interstate commerce element of a Hobbs Act violation is not superfluous – it is the hook by which the Federal Government gains jurisdiction." *Zeigler*, 19 F.3d at 495 (Ebel, J., dissenting).

[12]Arguably, this question was resolved in this circuit several years ago in *United States v. Whitt*, 718 F.2d 1494, 1500 (10th Cir. 1983). The defendant in *Whitt* was a county official in Oklahoma who was charged with violating the Hobbs Act in an extortion scheme. We held that evidence that the county was engaged in commerce, paid a kickback to a supplier, and thereby experienced a depletion of its assets was sufficient. The jury there was instructed that the government was required to prove that "the natural consequences of the acts alleged would be to delay,

(continued...)

In *Nguyen*, we considered whether the trial court had erred in instructing the jury that the government's burden was to show that as a consequence of the robbery charged there, "interstate commerce, or an item moving in interstate commerce, was actually ***or potentially*** delayed, obstructed, or affected in any way or degree." 155 F.3d at 1228 (emphasis added). In another instruction, the jury in *Nguyen* was told that the interstate commerce element could be established if the jury found that the defendant's actions "either caused, or ***would probably cause***, an effect on interstate commerce . . . ." *Id*. (emphasis added). Although these instructions in *Nguyen* were worded differently than the instructions given to the jurors in the instant case, we think it quite clear that the legal effect was the same. The instructions that we approved in *Nguyen* said that a potential effect on commerce would be sufficient, and the instruction here stated that it would be sufficient if the stolen funds could have been used to purchase additional goods in commerce. These differently worded instructions state the same legal standard. As we explained in *Nguyen*:

The use of the words actual, potential, and probable explain to the

---

[12](...continued)
interrupt or adversely affect" commerce. *Id*. On the same day that *Whitt* was decided, we upheld convictions in a similar case, in which we approved an instruction which stated that the government's burden was to show that the defendant "actually *or potentially* obstructed, delayed or affected interstate commerce or attempted to do so." *United States v. Boston*, 718 F.2d 1511, 1516 (10th Cir. 1983) (emphasis added). In neither of these cases was the jury instructed, as Wiseman asserts is required, that it was necessary to find that the extorted funds would have been used to buy more goods and supplies in commerce.

jury the type of effects on interstate commerce that the government must show to meet the jurisdictional requirement under the Hobbs Act. These words represent the kind of aggregate or cumulative impact that is the linchpin of the interstate commerce nexus established in *Wickard [v. Filburn]*, 317 U.S. [111,] 127-28 [(1942)]. Under an aggregate or cumulative analysis, and in the context of the instructions as a whole, the words probable and potential indicate to the jury that, like the wheat in *Wickard*, ***the government is not required to show that the particular stolen dollars themselves would have entered the stream of interstate commerce. Instead, the government must show only that the stolen dollars depleted the total assets of the restaurant which were available to engage in interstate commerce***.

We have held that a depletion of assets potentially affecting interstate commerce constitutes a sufficient nexus to interstate commerce under the Hobbs Act.

155 F.3d at 1228 (emphasis added).

Because we believe that the instructions given in this case required a finding of a potential effect on commerce, and because in *Nguyen* we specifically held that there was no error in instructing the jury that a potential effect on commerce would satisfy the interstate commerce element under the Hobbs Act, we must reject defendant's argument and hold that there was no error in the instructions here as to this point.

## C

In the last attack on the sufficiency of the evidence, Wiseman contends that he was wrongly convicted on the two counts brought under 18 U.S.C. § 924(c)(1) because there was no evidence to show that he aided and abetted a violation of this

statute by his accomplice, Martin. Section 924(c)(1) makes it a crime for anyone to use or carry a firearm during and in relation to a crime of violence or a drug trafficking crime. [13] In counts 6 and 8, the indictment charged that Martin and Wiseman violated section 924(c)(1) by using or carrying the Tec-9 firearm while committing the robberies in Silver City and Clovis, respectively. The indictment charged aider and abettor liability under 18 U.S.C. § 2 as well, and the government's theory at Wiseman's trial, as the prosecuting attorney explained in his closing argument, was that although Martin actually held the Tec-9 during the Silver City and Clovis robberies, Wiseman was responsible for aiding and abetting Martin's section 924 crime. VI R. at 302-304.

Thus, to find Wiseman guilty of these counts, the jury must have found that Martin used or carried a firearm during the last two robberies. On appeal, defendant argues that the government failed to show, with respect to the Clovis robbery, that Martin actually "used" the weapon in connection with the crime as the Supreme Court defined the term in *Bailey v. United States*, 516 U.S. 137 (1995). Defendant asserts that the witness to the Clovis robbery did not testify that Martin did anything with the gun. This argument is without merit. It is sufficient that Martin displayed the

---

[13]To establish federal jurisdiction, the underlying crime of violence or drug trafficking must be one for which the accused could be prosecuted in federal court. It is undisputed that robbery is a crime of violence within the meaning of this statute. We have already discussed the basis for federal jurisdiction of these robberies.

weapon, which he did with the obvious intent of intimidating the store employees and facilitating the robbery. V R. at 113. Displaying a firearm during the commission of a crime was recognized by the Court in *Bailey* as sufficient to constitute use. 516 U.S. at 148 ("The active-employment understanding of 'use' certainly includes brandishing, displaying, bartering, striking with, and, most obviously, firing or attempting to fire a firearm.").

As to the Silver City robbery, defendant's argument is so conclusory as to be without content. In a single sentence, he says that the supposed lack of identification evidence "must be combined with the lack of evidence as to aiding and abetting on the gun charge." Although this is merely conclusory, we will assume that defendant intended to adopt the same argument as to the Silver City robbery that he made as to the Clovis robbery, *i.e.* that there was insufficient evidence that Martin "used" the weapon. The record shows otherwise; Martin also displayed the Tec-9 weapon during the Silver City robbery. VI R. at 217-19. To the extent that defendant argues that the evidence did not show that he aided and abetted Martin's conduct, he is wrong. To the contrary, the evidence was easily sufficient to show that Wiseman knowingly and actively participated in the robberies and that he knew that Martin was carrying the firearm. *See United States v. Jones*, 44 F.3d 860, 869 (10th Cir. 1995) ("To be guilty of aiding and abetting, a defendant must willfully associate with the criminal venture and aid such venture through affirmative action.").

-41-

We find no error in overruling defendant's motion for judgment of acquittal on counts six and eight.

## VII

Defendant raises three issues with respect to the sentence imposed by the district court. We review questions of law regarding application of the Sentencing Guidelines *de novo* . *United States v. Farnsworth* , 92 F.3d 1001, 1007 (10 th Cir. 1996). We review findings of fact under the clearly erroneous standard, mindful of our obligation to give "due regard" to the district judge's determinations of the credibility of witnesses. *Id*. at 1009 (quoting 18 U.S.C. § 3742(e)).

## A

First, defendant contends that the district court erred in calculating his offense level on count one, the Santa Fe robbery. The district judge found in accordance with the recommendation of the Presentence Report (PSR) that Wiseman had used a firearm in connection with that robbery, which led to a five level increase in the offense level under U.S.S.G. § 2B3.1(b)(2)(C). Wiseman contends that this was error because only air pistols were used in the Santa Fe robbery. The Guidelines specifically define air guns as "dangerous weapons" rather than as "firearms," U.S.S.G. § 1B1.1 Application Note (e), and only a three level increase would have been applied had the sentencing court found that only air pistols had been used in the

robbery, instead of the five level increase the court actually applied. U.S.S.G. § 2B3.1(b)(2).

Defendant relies on his post-arrest statement, admitted at trial through the testimony of one of the interrogators, Agent Jessie. Defendant had told the authorities that he and Martin had used only air pistols in the first several robberies. The district court specifically found that a firearm had been used. Although the judge did not specify the basis for his ruling, the government had argued, as it does on appeal, that both of the witnesses to the Santa Fe robbery had described the gun carried by the shorter defendant (whom we know from the confession was Wiseman) as having a black barrel. V R. at 31, 40. In contrast, the air pistols recovered at the time of Wiseman's arrest and admitted as exhibits at trial had silver barrels. Thus, the district judge had conflicting evidence before him, and from the testimony of the witnesses could have found that an actual firearm was used in the Santa Fe robbery. We cannot conclude that the district court's resolution of this conflicting evidence was clearly erroneous.

**B**

The district court applied a two level increase for obstruction of justice, based on defendant's attempt to escape from the Torrance County Detention Center after his trial and before the sentencing hearing. Defendant contends that the evidence that he participated in the attempted escape was unreliable. Defendant refers to a report

concerning the alleged escape attempt which had been submitted to the court by the government and notes that he objected to this report, asking the district judge to require testimony at the sentencing hearing to establish the factual underpinning of this increase. The report is not in the record.

At the sentencing hearing, defendant merely made the bald assertion that the report did not have sufficient indicia of reliability to be considered by the court;[14] he gave no indication of the reasons for this position. On appeal, defendant merely recites the fact that he made the bald assertion in the district court. No specific assertion is made which would cast doubt on the reliability of the report. This gives us no basis for reversing the district court's ruling that the report had sufficient indicia of reliability, and accordingly we must affirm the district court on this point.

## C

At sentencing, the district court added three points to defendant's criminal history score for his conviction in state court for the commission of an armed robbery in Fayetteville, Arkansas. That robbery was committed a short time after the six New Mexico robberies and just prior to defendant's arrest. The judge also added two points for Wiseman's conviction in the District of Idaho for the offense of aiding and

---

[14]Thus, defendant implicitly acknowledged the well established principle that the sentencing court may consider relevant information without adherence to the formal rules of evidence, so long as the information has sufficient indicia of reliability. *United States v. Browning*, 61 F.3d 752, 755 (10th Cir. 1995); U.S.S.G. § 6A1.3(a).

abetting a federal prisoner to escape. That charge was based on the escape by Martin and Wiseman from custody in Idaho just prior to their beginning the string of robberies in New Mexico (see note 2, *supra*). Defendant's final criminal history score was thirteen, resulting in a criminal history category of VI.

While he does not contest any of the other prior convictions included in the calculation of his criminal history score, defendant contends that these two convictions just described should have been treated as related convictions under the Guidelines, with the result that only one point would have been added to his criminal history score under U.S.S.G. § 4A1.1(f), he says, instead of five. Defendant relies primarily on Application Note 3 to U.S.S.G. § 4A1.2, which provides in pertinent part:

> Prior sentences are not considered related if they were for offenses that were separated by an intervening arrest ( *i.e.*, the defendant is arrested for the first offense prior to committing the second offense). Otherwise, prior sentences are considered related if they resulted from offenses that (1) occurred on the same occasion, (2) were part of a single common scheme or plan, or (3) were consolidated for trial or sentencing.

It is clear that there was no intervening arrest here, defendant urges, and he then contends that the offenses were part of a single scheme or plan and so were to be treated as related under the above quoted language.

The district court's determination of whether offenses were related is a factual determination which we review only for clear error, but we review the application of the sentencing guidelines, including the meaning of the term "related," *de novo*.

-45-

*United States v. Alberty*, 40 F.3d 1132, 1133 (10 th Cir. 1994).  Defendant argues that the entire crime spree, from the escape from custody in Idaho to the eventual arrest in Arkansas, should have been treated as a single scheme or plan under this provision. This argument is legally flawed because it is based on a misunderstanding of the purview of Application Note 3.  The section to which this note is applicable, § 4A1.2(a)(2), refers to "prior sentences" and is not concerned with the counts of conviction.  As we have previously pointed out, "[t]he question of 'related cases,' referred to in § 4A1.2(a)(2), applies to the relationship between prior sentences, *not to the relationship between prior sentences and the present offense[s]."*  *United States v. Walling*, 936 F.2d 469, 471 (10 th Cir. 1991) (emphasis added) (citing *United States v. Banashefski*, 928 F.2d 349, 353 (10 th Cir. 1991)).  To the extent that § 4A1.2(a)(2) and Note 3 are applicable at all to defendant's position, we will consider whether the two previous sentences should have been treated as related to each other.

We have said that in considering whether prior convictions arose from a common scheme or plan, the focus should be on "factual commonality," as reflected in criteria such as "temporal and geographical proximity," and common victims. *United States v. Shewmaker*, 936 F.2d 1124, 1129 (10 th Cir. 1991).  The two crimes at issue here, the escape in Idaho and the robbery in Arkansas, were separated by several months in time and over a thousand miles in distance.  There were no common victims.  And defendant has not even alleged that when he fled the prison in Idaho he

-46-

was already planning a series of grocery store robberies in several states. To the contrary, in his confession defendant related forming the idea with Martin some time after the escape. We agree with the district judge that the Idaho escape and the Arkansas robbery were not related.

While we have noted that defendant's argument misapprehends the application of § 4A1.2(a)(2), we will consider what we perceive to be the gist of his argument – whether these two other convictions were so closely related to the counts of conviction that they should not have been included in his criminal history calculation. *See Walling*, 936 F.2d 469, 471. Under § 4A1.2(a), the "term 'prior sentence'" for which points are to be added to the criminal history score includes "any sentence previously imposed . . . for conduct not part of the instant offense." In this case the PSR indicates clearly that the two convictions under consideration were *not* treated as part of the instant offenses, either as "relevant conduct" or in any other way. Nor do we see any reason why they should be. The differences in time, place, and victims made each of these robberies clearly discrete events, so we could not find that the Arkansas robbery was part of the conduct involved in the New Mexico robberies, and likewise the escape clearly was a separate act by the defendant.

In short, we see no basis for disagreement with the district court's resolution of defendant's objections to the PSR, and find no error in the sentence imposed.

**AFFIRMED** .