UNITED STATES of America, Plaintiff–Appellee,

v.

John Jacob SANCHEZ, Defendant–Appellant.

No. 93–2112.

United States Court of Appeals, Tenth Circuit.

May 20, 1994.

---

Roger A. Finzel, Asst. Federal Public Defender, Albuquerque, NM, for defendant-appellant.

Rhonda P. Backinoff, Asst. U.S. Atty. (Larry Gomez, United States Atty., with her on the brief), Albuquerque, NM, for plaintiff-appellee.

Before EBEL and McKAY, Circuit Judges, and VAN BEBBER,* District Judge.

McKAY, Circuit Judge.

Defendant was convicted of bank robbery after the United States District Court for the District of New Mexico denied his motion to suppress certain identification evidence that involved a photo array shown to the witnesses before trial. Defendant now appeals the denial of his suppression motion, claiming that the photo array used by the police to identify him as the robber violated his due process rights.

On June 30, 1992, at approximately 2 p.m., an armed man entered the First National Bank in Albuquerque, New Mexico, and robbed the bank of over $1,000. The gunman was wearing large sunglasses and a baseball cap pulled down over his forehead. The robber moved quickly, and he was in the building for approximately two to three minutes. At different points during the hearings and trial, most of the witnesses contradicted themselves as to their attentiveness and their ability to view the robber's features. For every cite to the record in the government's brief indicating that a particular witness got a "good view," the Defendant is able to point to another area of the record where the same witness claimed he or she was not able to see the robber's face during the encounter. Immediately after the event, eyewitnesses gave descriptions of the robber to law enforcement

* Honorable G. Thomas Van Bebber, United States District Judge for the District of Kansas, sitting by designation.

officers. The descriptions varied from white-skinned Anglo to dark-skinned Hispanic, Spanish accent to no accent, facial acne to clear complexion, and heavy facial hair to light or no facial hair. The witnesses seemed to agree that the robber was short in height—descriptions varied from 5′2″ to 5′7″—and that he was probably in his late teens or early twenties.

One of the tellers and eventual witnesses, Jennifer Harriman, had a sense that the robber's visible features were familiar and concluded that he might be a customer of the bank. She remembered that the robber was young, Hispanic, and spoke in the Spanish slang popular in area high schools. She conveyed her impressions to her fellow employees, some of whom later identified Mr. Sanchez in the photo array and at trial. A few days after the robbery, Agent Olivas received a crimestopper's tip that Mr. Sanchez had committed the robbery. Agent Olivas found a 1987 high school yearbook with Mr. Sanchez' freshman picture in it. He took the yearbook to the bank and asked Ms. Harriman whether any of the forty-one students on the yearbook page "looked familiar." Ms. Harriman selected Mr. Sanchez' picture, but she testified at the suppression hearing that she had selected him because she recognized him as a customer, not as the robber. She also stated at the hearing that she soon thereafter told some of the other employee-witnesses about the officer and the yearbook, that she had selected a picture from the yearbook, and that the picture was of a prior customer of the bank as she had suspected.

A little over a week after the robbery, Agent Olivas showed a photo array containing Mr. Sanchez' picture to eight witnesses. Mr. Sanchez was the only man in the array that was a prior customer of the bank. The facts are in dispute as to whether Agent Olivas told the witnesses to select the robber or merely someone they recognized. Four of the eight witnesses selected Mr. Sanchez' picture. Three of the four witnesses who identified Mr. Sanchez' picture from the array testified against Mr. Sanchez at trial; two identified Mr. Sanchez as the robber and the third identified him as a customer of the bank.

The other evidence of guilt, besides the anonymous tip and the identifications, was Mr. Sanchez' handprint found on the glass door exiting the bank. Mr. Sanchez claimed that he had been in the bank a day or two before the robbery to cash a check, and he presented evidence that he had in fact received a paycheck at that time. He presented an expert who indicated that handprints could last for months under such conditions. Mr. Sanchez also points to evidence in the record which suggests that the robber opened the glass door with his shoulder, because his hands were full of money. The government, on the other hand, presented evidence that the glass door had been cleaned the night before the robbery. The government also contests Mr. Sanchez' assertion that the robber pushed open the glass door with his shoulder.

As previously stated, Defendant challenges the constitutionality of the photo array identifications. He alleges that the array was impermissibly suggestive, and that the circumstances surrounding the identifications were not sufficient to make them nevertheless reliable. The photo array in question contained only six pictures, one of which was of the Defendant. Defendant contends that the array was suggestive because his photograph stood out from the others and because it contained several irregularities which led the witnesses to select his picture for irrelevant reasons. Specifically, Defendant points to the fact that he was the only man in the array with his eyes closed—all of the other men had their eyes open and four of the five men were staring directly into the camera. Defendant contends that this fact is particularly important because the robber was wearing dark sunglasses that prevented the witnesses from viewing his eyes. His theory is that the witnesses avoided picking one of the other five pictures because the staring and the overall strong presence of eyes that marked those pictures made them very dissimilar to the witness' memories of the robber.

When the constitutionality of a photo array is challenged, the due process clause requires a two-pronged inquiry: first, the court must determine whether the photo ar-

ray was impermissibly suggestive, and if it is found to be so, then the court must decide whether the identifications were nevertheless reliable in view of the totality of the circumstances. *See Simmons v. United States,* 390 U.S. 377, 384, 88 S.Ct. 967, 971, 19 L.Ed.2d 1247 (1968); *Johnston v. Makowski,* 823 F.2d 387, 391 (10th Cir.1987), *cert. denied,* 484 U.S. 1026, 108 S.Ct. 750, 98 L.Ed.2d 763 (1988). These two prongs must be analyzed separately, and it is only necessary to reach the second prong if the court first determines that the array was impermissibly suggestive. *Johnston,* 823 F.2d at 391. In denying Defendant's suppression motion, the district court made no factual findings as required by Federal Rule of Criminal Procedure 12(e), but merely recited the two-pronged *Simmons* standard in a one-page order. While we must review the district court's underlying factual findings, if any were made, under the clearly erroneous standard, *United States v. Thody,* 978 F.2d 625, 629 (10th Cir.1992), the ultimate question of whether trial and pretrial identification evidence infringed due process rights is reviewed de novo. *Grubbs v. Hannigan,* 982 F.2d 1483, 1489 n. 5 (10th Cir.1993).

 Accordingly, we must now turn to the first prong of *Simmons, i.e.,* whether the photo array was impermissibly suggestive. Courts use a number of factors to make this determination, including the size of the array, the manner of its presentation by the officers, and the details of the photographs themselves. *See United States v. Rosa,* 11 F.3d 315, 330 (2d Cir.1993). Although Defendant alleges that the presentation by the officer in this case was suggestive and prejudicial, the bulk of his argument on appeal involves the third factor, the details of the photographs. Before analyzing the photographs, however, we must first determine the effect that the first factor, the size of the array, has on our analysis. As stated *supra,* courts have recognized that the size of a photo array, in terms of the number of pictures in it, is a factor in determining the array's constitutionality. To this end, courts have held that a photo array with as few as six pictures is not per se unconstitutional. *See Rosa,* 11 F.3d at 330; *United States v. Bennett,* 409 F.2d 888, 898 (2d Cir.), *cert.*

*denied,* 396 U.S. 852, 90 S.Ct. 117, 24 L.Ed.2d 101 (1969). *See also United States v. Smith,* 551 F.2d 348, 355 n. 13 (D.C.Cir. 1976) (noting that photo arrays in England usually contain at least eight photographs and the range is fifteen to twenty photographs in France). Other than attempting to prescribe constitutional minimums, however, the federal courts have been less than clear about what role the size of an array plays in the *Simmons* equation.

After analyzing many of the federal cases dealing with due process challenges to photo arrays, we believe that the number of photographs in an array is not itself a substantive factor, but instead is a factor that merely affects the *weight* given to other alleged problems or irregularities in an array. The larger the number of pictures used in an array, the less likely it is that a minor difference, such as background color or texture, will have a prejudicial effect on selection. In such a case, the differences become diluted and less obvious among the large number of images, each of which are likely to contain some sort of minor idiosyncratic aberration. *See Simmons,* 390 U.S. at 386 n. 6, 88 S.Ct. at 972 n. 6. This is not to say that one color picture cannot stand out in an array of one thousand black and white pictures, but on the whole, minor irregularities will be less noticeable and prejudicial as the number of photographs increases. *Id.*

Conversely, when a relatively low number of photographs are used in an array, minor differences such as background color can make a picture stand out, and can act to repeatedly draw a witness's eyes to that picture. Common sense dictates that slight irregularities are more likely to "jump out" at a witness reviewing a single sheet of paper with only six photographs on it than at a witness reviewing a large mug book containing hundreds of photographs. Upon continued inspection, the witness may begin to believe that the "oddball" picture was taken under different circumstances than the others. This fact can suggest a number of things to the witness, the most dangerous of which is that the similar pictures were taken together to form a pool or control group, and that the one picture that stands out is the

suspect. Thus, the number of pictures in an array relates to a fixed point on a sliding scale that can be used to determine the effect that irregularities in a picture may have had on its viewer. The lower the number of photographs used by officers in a photo array, the closer the array must be scrutinized for suggestive irregularities.

■ Applying the above analysis to the facts before us, the government in this case constructed a photo array with only six photographs—a number sufficiently small to weigh heavily in the balance of factors to be considered. The court has examined the array with the size of the array in mind and noting both the similarities and differences in each of the pictures. Notwithstanding the differences emphasized by Defendant, we do not believe that the array is unconstitutionally suggestive. Looked at after each of the differences are described by Defendant, one can see enough irregularities to raise some concern. However, presented without comment on the details (as this array was), we are not persuaded that the differences in Defendant's picture would necessarily lead the eye of the unguided viewer to his photograph given that all of the depicted persons are very similar in their physical appearance.

Having held that the photo array was not impermissibly suggestive, we need not reach the second prong of the *Simmons* test. The judgment of the district court is affirmed.

AFFIRMED.