**F I L E D**
**United States Court of Appeals**
**Tenth Circuit**

**MAY 30 2000**

**PATRICK FISHER**
**Clerk**

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

---

UNITED STATES OF AMERICA,

    Plaintiff-Appellee,

v.

WAYNE EUGENE FORTUNE,

    Defendant-Appellant.

No. 99-6337

(D.C. No.99-CR-13-T)
(W.D. Okla.)

---

**ORDER AND JUDGMENT** [*]

---

Before **EBEL, McKAY,** and **BRISCOE** , Circuit Judges.

Wayne Eugene Fortune appeals his criminal conviction and sentence. A jury determined that Fortune robbed a fuel station at gunpoint and convicted him of interfering with interstate commerce by robbery, in violation of 18 U.S.C. § 1951; using or carrying a firearm in relation to a crime of violence, in violation of 18 U.S.C. § 924(c); and possessing a firearm despite a previous felony conviction, in violation of 18 U.S.C. § 922(g). The district court, applying what is commonly known as the "Three Strikes" law, see 18 U.S.C. § 3559(c),

---

[*] This order and judgment is not binding precedent, except under the doctrines of law of the case, res judicata, and collateral estoppel. The court generally disfavors the citation of orders and judgments; nevertheless, an order and judgment may be cited under the terms and conditions of 10th Cir. R. 36.3.

sentenced Fortune to life imprisonment.  We exercise jurisdiction pursuant to 28 U.S.C. § 1291 and affirm.

## I.  BACKGROUND

On September 15, 1998, Brian Blake and Kenny Benard were working the graveyard shift at the Oasis Travel Center ("Oasis"), a truck stop and convenience store located near Interstate 35 in Oklahoma City.  At approximately 1:30 a.m., Blake observed two men entering the store.     One of the men went to the back of the store, while the other purchased a Coke.  The two men then left the store together.   The men returned to the store about an hour later, while Blake and Benard were taking a break at a table near the store's entrance.      One of the men pointed a gun at Blake's face and ordered the employees to walk behind the fuel desk and open the cash drawers.     Blake and Benard complied, removing the money and placing it on a table.     The robbers then ordered Blake and Benard to "get down on the floor," and one of the robbers struck Blake in the back of the head with the gun.    Transcript ("Tr.") at 68.  After the robbers left the store, Benard called the police.

While the robbery was taking place, Oklahoma City police officer Bryan Edwards was three miles south of the Oasis, near an access road to Interstate 35. Edwards parked his car at the intersection to divert traffic from debris in the road. Edwards heard "tires squealing" and saw a white four-door GM automobile

2

traveling south on the access road at a high rate of speed.        Tr. at 7, 21, 91.  No other vehicle approached the intersection while Edwards was stationed there.        The automobile stopped at the intersection and turned west.        From a distance of about 25 feet, Edwards observed two black males through the tinted windows of the automobile, both wearing white T-shirts.        Overhead lights from Interstate 35 illuminated the intersection.        Moments after the automobile turned the corner and headed west, Edwards received a radio report of the Oasis robbery.        The report identified the suspects as two black males wearing light-colored T-shirts, driving a white Cadillac.

Edwards decided to pursue the automobile.  Edwards noted that the automobile resembled the one described in the radio report, that its occupants were two black males, and that it approached from the direction of the robbery.  Edwards caught up to the automobile and followed it for roughly three-quarters of a mile until other officers arrived.        When the other units arrived, Edwards activated his overhead lights and attempted to stop the automobile.        The automobile slowed down, sped up, and changed direction several times before pulling over.

Officers then approached the occupants of the automobile.  Ervin Wineberry was later identified as the driver, and Fortune was identified as the passenger.   Fortune initially refused to raise both hands in response to the

3

officers' orders, keeping one hand in the center area of the front seat. After removing Wineberry and Fortune from the automobile and arresting them, officers searched the vehicle and discovered a loaded pistol behind the center armrest. Officers also discovered an unopened bottle of Diet Coke, still cold with condensation on it. Officers searched Fortune and discovered a large roll of money in the groin area of Fortune's pants. Officers seized bills worth $1,269.00, which were separated with paper clips by denomination. At the time of his arrest, Fortune was wearing a baseball cap. The cap matched the one worn by the Oasis robber with the gun.

One of the officers who arrived at the scene was Ron Pisano. After Fortune and Wineberry were arrested, Pisano and another officer went back to the Oasis to secure the store and to speak with Blake and Benard. Blake and Benard described the robbers as black males wearing white T-shirts. Blake and Benard also stated that the robber who wielded the gun wore a ball cap. Pisano then drove Blake and Benard to the arrest location. Pisano informed Blake and Benard that officers had "a vehicle stopped with some individuals in it," and that he wanted the victims to "look at the car and the individuals and tell us if they had anything to do with the robbery." Tr. at 33-34. While driving to the scene, Benard asked several questions about the vehicle and the suspects, which Pisano declined to answer. At the location of the arrest, officers handcuffed Fortune and Wineberry

4

and placed them in separate police cars. Blake and Benard individually viewed Fortune, Wineberry, and the suspect automobile. Blake and Benard stated that they were "100 percent sure without a doubt" that Fortune and Wineberry were the perpetrators of the robbery. Tr. at 35.

A grand jury returned a three-count indictment against Fortune and Wineberry. The indictment charged the two men with violations of 18 U.S.C. §§ 1951 (Count 1), 924(c)(1) (Count 2), and 922(g)(1) (Count 3). Prior to trial, the government notified Fortune that it would seek a sentence of life imprisonment on Count 1 pursuant to 28 U.S.C. § 3559(c). The government indicated that it planned to use Fortune's previous convictions in Oklahoma county court to justify the enhanced sentence. Fortune sought to suppress much of the government's evidence in several pre-trial motions. In these motions Fortune (1) took exception to the "suggestive show-up identification technique" used by police officers at the location of the arrest, Doc. 28 at 2; and (2) asserted that the officers did not have probable cause to arrest him. The district court denied Fortune's motions.

After Wineberry pleaded guilty to the underlying offenses, Fortune's case proceeded to trial. At the close of the government's case, Fortune moved for a judgment of acquittal. Fortune argued that an acquittal was warranted because the evidence failed to show that his alleged conduct had any effect on interstate

5

commerce. The district court denied this motion as well. The jury subsequently found Fortune guilty on all counts. The court sentenced Fortune to concurrent terms of life imprisonment on Count 1 and 180 months imprisonment on Count 3. Fortune received a term of 60 months imprisonment on Count 2.

## II. THE MOTION TO SUPPRESS EVIDENCE OBTAINED AS A RESULT OF THE ARREST

Fortune contends the district court erred by denying his motion to suppress evidence obtained as a result of his arrest. When reviewing such a denial, "we view the evidence in the light most favorable to the government and accept the district court's factual findings unless clearly erroneous." United States v. Dickerson, 195 F.3d 1183, 1186 (10th Cir. 1999); accord United States v. McKissick, 204 F.3d 1282, 1296 (10th Cir. 2000); United States v. Hill, 199 F.3d 1143, 1147 (10th Cir. 1999). "Keeping in mind that the burden is on the defendant" in most cases to prove that "the challenged seizure was illegal under the Fourth Amendment," the ultimate determination of reasonableness is a question of law subject to de novo review. McKissick, 204 F.3d at 1296 (quoting United States v. Long, 176 F.3d 1304, 1307 (10th Cir.), cert. denied, 120 S. Ct. 283 (1999)); accord Hill, 199 F.3d at 1147. We consider "the totality of the circumstances" when assessing the reasonableness of a particular seizure. Dickerson, 195 F.3d at 1186; accord McKissick, 204 F.3d at 1296.

6

Fortune's main argument on appeal is that officers unjustifiably arrested him without a warrant. It is settled that "[l]aw enforcement personnel may arrest a person without a warrant if there is probable cause to believe that person committed a crime." United States v. Gordon, 173 F.3d 761, 766 (10th Cir.), cert. denied, 120 S. Ct. 205 (1999); see also United States v. Dozal, 173 F.3d 787, 792 (10th Cir. 1999) (echoing that "a warrantless search must be supported by probable cause"). The probable cause inquiry requires us to determine whether "an officer has learned of facts and circumstances through reasonably trustworthy information that would lead a reasonable person to believe that an offense has been or is being committed by the person arrested." United States v. Anchondo, 156 F.3d 1043, 1045 (10th Cir. 1998); accord McKissick, 204 F.3d at 1296 n.5; Dozal, 173 F.3d at 792. Probable cause requires "more than mere suspicion," but it "need not be based on facts sufficient for a finding of guilt." Dozal, 173 F.3d at 792 (quoting United States v. Vazquez-Pulido, 155 F.3d 1213, 1216 (10th Cir.), cert. denied, 119 S. Ct. 437 (1998)).

The evidence clearly supports the denial of Fortune's motion to suppress. In the early morning hours of September 15, 1998, officer Edwards personally observed a white automobile traveling on an access road from the direction of the Oasis. The automobile was the only vehicle seen by Edwards while he was diverting traffic. The automobile approached at a high rate of speed, with "tires

7

squealing" as it neared the intersection. Aided by the overhead lights from the interstate highway, Edwards saw two black males wearing white T-shirts in the automobile. Edwards observed the two men from a distance of approximately 25 feet. Moments after the automobile passed through the intersection, Edwards received a radio report detailing a robbery that had occurred only three miles from his location. Using the victims' descriptions of the robbers, the report identified the suspects as two black males wearing white T-shirts in a white vehicle. These facts and circumstances plainly establish that Edwards and other officers had probable cause to pursue and arrest Fortune. Searches incident to that lawful arrest were proper. See United States v. Green, 178 F.3d 1099, 1107 (10th Cir. 1999) (upholding a search of a defendant's vehicle incident to lawful arrest); Anchondo, 156 F.3d at 1045 ("[O]fficers may conduct a warrantless search of a person when it is incident to a lawful arrest of that person.").

Fortune's arguments to the contrary are unpersuasive. For example, Fortune asserts that several other facts cut against the district court's finding of probable cause. Fortune points out that (1) the access road was not the only route the robbers could have taken from the Oasis; (2) by itself, the white automobile's "high rate of speed" did not prompt Edwards to take action; (3) the automobile was a Buick, not a Cadillac as described in the radio report; and (4) the automobile had tinted windows. None of these facts demonstrates that Edwards'

8

decision to pursue and arrest Fortune was based on "mere suspicion" and thus violated the Fourth Amendment. Viewing the record in the light most favorable to the government, the information available to Edwards easily could have led a reasonable person to believe that the occupants of the automobile were responsible for the Oasis robbery. Fortune also maintains that United States v. De la Cruz-Tapia , 162 F.3d 1275 (10th Cir. 1998) requires us to reverse the district court. We disagree. In that case, we held that a border patrol officer in an unmarked police car lacked probable cause to stop a vehicle simply because (1) the vehicle was an "older model;" (2) the driver of the vehicle did not make eye contact with the officer; (3) the vehicle made an abrupt exit from the highway; (4) the driver stopped at a gas station and opened the hood and trunk; and (5) the vehicle had crossed the border several times in the last few days. 162 F.3d at 1278-80. To state the obvious, no officer in De la Cruz-Tapia observed individuals who matched a description of fleeing felons in a police dispatch, let alone individuals traveling at a high rate of speed from the direction of a robbery on an otherwise deserted roadway.

### III.  THE MOTION TO SUPPRESS IDENTIFICATION EVIDENCE

Fortune also contends the court erred by denying his motion to suppress the identification evidence that resulted from his out-of-court identification at the

9

scene of the arrest. Whether an identification procedure violates the Due Process Clause is "a question of law, which we review de novo." United States v. Smith, 156 F.3d 1046, 1050 (10th Cir. 1998), cert. denied, 525 U.S. 1090 (1999); accord United States v. Brown, 200 F.3d 700, 707 (10th Cir. 1999), cert. denied, 120 S. Ct. 1213 (2000). We review the district court's findings of fact on this issue "under the clearly erroneous standard." United States v. Sanchez, 24 F.3d 1259, 1262 (10th Cir. 1994); accord United States v. Wiseman, 172 F.3d 1196, 1208 (10th Cir.), cert. denied, 120 S. Ct. 211 (1999). When examining the constitutionality of a pre-trial identification procedure, "we must engage in a two-tier analysis. First, we must determine whether the procedure was unnecessarily suggestive. If the procedure is found to have been unnecessarily suggestive, we must then weigh the corrupting influence of the suggestive procedure against the reliability of the identification itself." Grubbs v. Hannigan, 982 F.2d 1483, 1489-90 (10th Cir. 1993) (citing, among other cases, Manson v. Brathwaite, 432 U.S. 98, 114 (1977)). "Only when a pre-trial identification procedure is so unnecessarily suggestive that it is 'conducive to irreparable mistaken identification' does the procedure violate due process." Id. at 1490 (quoting Kirby v. Illinois, 406 U.S. 682, 691 (1972)); accord United States v. Thurston, 771 F.2d 449, 452 (10th Cir. 1985).

Turning to the case at hand, we assume without deciding that the

10

identification technique used by law enforcement officials was unnecessarily suggestive. This leads us to the second prong of the analysis, in which we must balance the "corrupting influence" of the suggestive procedure against the reliability of the identification. At least five factors are relevant to any assessment of reliability. As the Supreme Court explained in Neil v. Biggers, 409 U.S. 188 (1972),

> the factors to be considered in evaluating the likelihood of misidentification include the opportunity of the witness to view the criminal at the time of the crime, the witness' degree of attention, the accuracy of the witness' prior description of the criminal, the level of certainty demonstrated by the witness at the confrontation, and the length of time between the crime and the confrontation.

Id. at 199-200; accord Brown, 200 F.3d at 707; Smith, 156 F.3d at 1051.

The evidence in this case demonstrates that the likelihood of misidentification was minuscule, notwithstanding the suggestive identification procedure used at the location of the arrest. First and foremost, Blake had a reasonable opportunity to view Fortune at the time of the crime. Fortune did not wear a disguise when he entered the Oasis, and the interior of the store was "lit very well." Tr. at 33; cf. Wiseman, 172 F.3d at 1210 (approving an identification in part because a store was "well lighted" and the perpetrator's face "was not covered"); Grubbs, 982 F.2d at 1491 (finding that a witness had an opportunity to view a defendant in part because the crime "occurred in a lighted lobby"); Thurston, 771 F.2d at 453 (reaching the same conclusion in part because "the

11

lighting conditions were adequate"). Blake not only viewed Fortune for several seconds at the time of the robbery, cf. Archuleta v. Kerby, 864 F.2d 709, 712 (10th Cir. 1989) (citing cases upholding identifications based on several seconds of observation), but also saw Fortune prior to the robbery when Fortune and Wineberry entered the store to purchase a Coke. Blake testified that he remembered Fortune and Wineberry when they returned to the store, believing that "they just forgot something." Tr. at 66; cf. Wiseman, 172 F.3d at 1210 (approving an identification in part because a witness "noticed defendant before he had shown his weapon and demanded money").

The remainder of the Biggers factors similarly demonstrate that there was little likelihood of misidentification. Blake remembered Fortune when he re-entered the store, and Fortune and Wineberry were the only patrons inside the Oasis at the time of the robbery. The description of the robbers' attire given by Blake and Benard matched the attire worn by Fortune and Wineberry at the time of their arrest. Cf. Wiseman, 172 F.3d at 1210 (finding an identification reliable in part because "the witnesses' descriptions were fairly accurate, if not especially detailed"); Thurston, 771 F.2d at 453 (reaching a similar conclusion based in part on a prior description that was "reasonably accurate"). Both before and during trial, Blake identified Fortune as one of the perpetrators with "100 percent" certainty. Cf. Smith, 156 F.3d at 1052 (approving an identification in part

12

because a witness testified that he was "real sure" of the identity of a suspect); Archuleta , 864 F.2d at 712 (making a finding of reliability based in part on a victim's identification that was "unequivocal at all times"). Finally, Blake's identification of Fortune took place only 30 minutes after the robbery, a "short interval of time" that "adds to the reliability of the identification." Archuleta , 864 F.2d at 712; cf. Grubbs , 982 F.2d at 1490 (upholding an identification in part because it "occurred within a week of the crime"); Thurston , 771 F.2d at 453 (reaching a similar conclusion in part because the identification took place within four hours of the incident). In view of this evidence, we conclude that the identification technique used by police officers did not deprive Fortune of his right to due process.

## IV. THE MOTION FOR JUDGMENT OF ACQUITTAL

Fortune next contends that the evidence was insufficient to support his convictions on Counts 1, 2, and 3. "Sufficiency of the evidence to support a jury's verdict is a legal issue which is reviewed do novo." McKissick , 204 F.3d at 1289; accord Wiseman , 172 F.3d at 1212. The relevant question on appeal is "whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Wiseman , 172 F.3d at 1212 (quoting

13

Jackson v. Virginia, 443 U.S. 307, 318-19 (1979)); accord United States v. McIntosh, 124 F.3d 1330, 1334 (10th Cir. 1997). We "presume the jury resolved evidentiary conflicts in favor of the prosecution, and we defer to the jury's resolution." United States v. Roberts, 185 F.3d 1125, 1140 (10th Cir. 1999), cert. denied, 28 U.S.L.W. 3840 (U.S. May 15, 2000); see also McKissick, 204 F.3d at 1289-90 (emphasizing that "[i]t is for the jury" to "resolve conflicting testimony, weigh the evidence, and draw inferences from the facts presented").

Fortune argues that his convictions on Counts 1 and 2 should be reversed because the government failed to show that the Oasis robbery affected interstate commerce as required by 18 U.S.C. § 1951(a). That section of the Hobbs Act penalizes an individual who "in any way or degree obstructs, delays, or affects commerce or the movement of any article or commodity in commerce" by robbery. The language of the statute "shows the intent to 'use all the constitutional power Congress has' to protect interstate commerce." Wiseman, 172 F.3d at 1214 (quoting Stirone v. United States, 361 U.S. 212, 215 (1960)). Accordingly, to support a conviction under the Act the government must show only a "minimal effect" on commerce. United States v. Nguyen, 155 F.3d 1219, 1224 (10th Cir. 1998), cert. denied, 525 U.S. 1167 (1999); see also Wiseman, 172 F.3d at 1214 (stating that the effect on commerce can be "de minimis"); United States v. Bolton, 68 F.3d 396, 399 (10th Cir. 1995) (same). This "minimal effect"

14

on commerce "may be established by evidence that the assets of a business engaged in interstate commerce, or which customarily purchases items in interstate commerce, are depleted. The depletion of assets curtails 'the victim's potential as a purchaser of such goods.'" Nguyen, 155 F.3d at 1224 (quoting United States v. Ziegler, 19 F.3d 486, 489-90 (10th Cir. 1994)); see also United States v. Romero, 122 F.3d 1334, 1340 (10th Cir. 1997) (discussing the "depletion of assets" theory).

The evidence presented by the government plainly establishes that Fortune's conduct had at least a "minimal effect" on interstate commerce. First, the robbery interfered with fuel sales to interstate carriers. The vice president of the company that owns the Oasis testified at trial that the store sells fuel to carriers who transport cargo "from one part of the country to another," and that about 75% of the Oasis' business "is generated from out-of-state customers." Tr. at 130. Because the store was closed for two hours while the robbery was under investigation, a number of trucks were unable to pull up to the fueling island. Second, and in the same vein, the robbery depleted the store's revenues. The cash taken by Fortune and Wineberry serves as an obvious example. Moreover, the store was unable to sell both fuel and other products during the pendency of the investigation. According to the vice president, the shut-down deprived the Oasis of a portion of the $25,000 to $28,000 in revenues the store receives each day.

15

The vice president further stated that the store purchases fuel and other products for resale from companies in Texas and Illinois. Fortune argues that this evidence does not "directly" show that commerce was obstructed. However, the government is not required to present evidence that commerce was in fact obstructed. The government satisfies its burden of proof on the interstate commerce element if it shows "only a potential effect on commerce." Wiseman, 172 F.3d at 1216; see also Zeigler, 19 F.3d at 493 ("A jury may infer that interstate commerce was affected to some minimal degree from a showing that the business assets were depleted.").

Fortune's attack on the sufficiency of the evidence for Count 3 is equally groundless. Fortune asserts that his conviction on that count should be reversed because the government failed to show that he possessed a firearm, an essential element under 18 U.S.C. § 922(g). See United States v. Adkins, 196 F.3d 1112, 1117 (10th Cir. 1999) (confirming that a conviction under § 922(g) requires proof that the defendant "knowingly possessed a firearm"), cert. denied, 120 S. Ct. 1446 (2000); United States v. Wilson, 107 F.3d 774, 779 (10th Cir. 1997) (same). "It is well settled the required 'possession' for purposes of § 922(g) includes both actual and constructive possession." United States v. Taylor, 113 F.3d 1136, 1144 (10th Cir. 1997); accord Adkins, 196 F.3d at 1118. The evidence fully establishes that Fortune actually possessed a weapon. Blake testified that he saw

16

Fortune use a gun during the robbery, and the videotape from a surveillance camera in the store corroborates Blake's testimony. That officers discovered the weapon beneath the armrest of the automobile only strengthened the government's already solid case of actual possession.

## V. THE "THREE STRIKES" LAW

Fortune challenges both the constitutionality and the district court's application of the "Three Strikes" provision in 18 U.S.C. § 3559(c). The statute requires a trial court to "sentence to life in prison any person who is convicted in federal court of a 'serious violent felony' if that person has previously been convicted in state or federal court of two or more 'serious violent felonies.'" United States v. Gottlieb, 140 F.3d 865, 866 (10th Cir. 1998) (quoting § 3559(c)(1)); accord United States v. Mackovich, ___ F.3d ____, Nos. 99-2006 & 99-2179, 2000 WL 485091, at *9 (10th Cir. Apr. 25, 2000); United States v. Willis, 102 F.3d 1078, 1085 (10th Cir. 1996). The offense of robbery is "generally considered a 'serious violent felony' for purposes of the Three Strikes statute." Gottlieb, 140 F.3d at 866 (citing § 3559(c)(2)(F)); accord United States v. Oberle, 136 F.3d 1414, 1423 (10th Cir.), cert. denied, 119 S. Ct. 197 (1998). However, not all serious violent felonies count as "strikes." The statute provides that a robbery is a "nonqualifying felony" if the defendant establishes, by clear

17

and convincing evidence, that

> (i) no firearm or other dangerous weapon was used in the offense and no threat of use of a firearm or other dangerous weapon was involved in the offense; and
> (ii) the offense did not result in death or serious bodily injury (as defined in section 1365) to any person.

18 U.S.C. § 3559(c)(3)(A); accord Mackovich , 2000 WL 485091, at *9-*10; Romero , 122 F.3d at 1342. Against this statutory backdrop, we address Fortune's arguments in reverse order.

A.    Application

The district court imposed a sentence of life imprisonment on the following grounds. The court counted as Fortune's first "strike" a conviction in Oklahoma state court for robbery with firearms (case number CRF-69-2665). The court counted as Fortune's second "strike" a conviction in Oklahoma state court for first degree rape. The court also noted that, "although not necessary for the enhancement," Fortune pleaded guilty to robbery with firearms in a separate case in Oklahoma state court (case number CRF-69-2975). Tr. at 194. After reviewing court records and police reports relating to these charges, the court determined that Fortune's previous robbery convictions involved firearms and did not constitute "nonqualifying felonies" under § 3559(c)(3)(A).

On appeal, Fortune concedes the district court's use of the rape conviction was proper, but argues that his previous robbery offenses should not have been

18

counted as "strikes." Fortune asserts that "[t]here is no evidence that death or serious bodily injury occurred as a result of the alleged robberies," Appellant's Brief at 35, and the government does not contend on appeal that Fortune failed to satisfy the requirements of § 3559(c)(3)(A)(ii). Fortune then asserts that he satisfied the requirements of § 3559(c)(3)(A)(i) by presenting clear and convincing evidence that neither CRF-69-2665 nor CRF-69-2975 involved the use (or threat of use) of a firearm. The government disagrees, arguing that firearms were indeed "used" in both of these cases. "We review de novo a sentence enhancement imposed pursuant to section 3559(c)." Romero, 122 F.3d at 1342; accord Gottlieb, 140 F.3d at 868; see also Willis, 102 F.3d at 1085 (stating that this court reviews de novo "challenges to the legality of a sentence").

Our analysis necessarily begins with the Gottlieb decision, in which we discussed the meaning of "use" and "threat of use" for purposes of § 3559(c)(3)(A)(i). Analogizing to 18 U.S.C. § 924(c), we borrowed the Supreme Court's definition of "use" in Bailey v. United States, 516 U.S. 137 (1995). We thus concluded that "use" involves "active employment of the firearm by the defendant" that "makes the firearm an operative factor in relation to the predicate offense." Gottlieb, 140 F.3d at 868 (quoting Bailey, 516 U.S. at 143). "Active employment" includes "brandishing, displaying, bartering, striking with, and most obviously, firing or attempting to fire, a firearm." Id. (quoting Bailey, 516 U.S.

19

at 148); see also id. at 869 ("As the Bailey Court recognized, the plain meaning of the word 'use' implies 'action and implementation.'"). We added that the term "use" does not encompass "mere possession or storage of a firearm." Id. at 868. We then commented that the phrase "threat of use" in § 3559(c)(3)(A)(i) could be construed to mean "a communicated intent to use a firearm" or "a risk that a firearm would be used in the offense;" we also noted that the phrase could incorporate both meanings. Id. at 873.

With these definitions in mind, we affirm the district court's finding that CRF-69-2665 involved the "use" or "threat of use" of a firearm. The police report submitted in connection with this offense indicates that Fortune and a co-defendant used a weapon to steal another person's leather coat. The report states that the victim "positively identified" Fortune as "the subject who had pulled the gun and taken his coat." Appellant's Appendix ("Aplt. App.") at 50; Tr. at 171-72. The witness list for the case similarly states that the victim planned to testify that at the time of the robbery, Fortune "pulled a .25 caliber blue steel pistol from his pocket, threatened him with it & took a black leather coat from his person." Aplt. App. at 53. A follow-up report reiterates that the victim "positively identified" Fortune as "the one who pointed the gun at him, a .25 automatic, blue steel, and took his black leather coat." Id. at 54; Tr. at 172-73. These documents affirmatively establish that CRF-69-2665 involved the use or threat of use of a

20

firearm, foreclosing any argument that the robbery fails to qualify as a "strike" under § 3559(c)(3)(A). Because CRF-69-2665 and the rape conviction independently support the district court's imposition of a life sentence, we need not consider whether CRF-69-2975 constitutes an additional "strike."

### B.    Constitutionality

Fortune's constitutional challenge to the "Three Strikes" provision is twofold. First, Fortune submits that § 3559(c)(3) "unconstitutionally shifts the burden to the defendant to prove a prior robbery conviction does not qualify as a predicate offense." Appellant's Brief at 29. In Fortune's view, the statute "requires that the robbery conviction involve the use or threatened use of a dangerous weapon or death or serious bodily injury before it will qualify as a predicate offense. As written, the statute presumes the existence of these elements and shifts the burden to the defendant to disprove the elements." Id. Second, Fortune argues that even if this burden-shifting scheme is constitutional, the standard of proof imposed by the statute is too high. According to Fortune, § 3559(c)(3) violates the Due Process Clause by requiring a defendant to establish nonqualifying offenses with "clear and convincing" evidence. "We review de novo challenges to the constitutionality of a statute." United States v. Hampshire, 95 F.3d 999, 1001 (10th Cir. 1996); accord Bolton, 68 F.3d at 398; United States v. Wilks, 58 F.3d 1518, 1519 (10th Cir. 1995).

21

Our recent decision in United States v. Smith, ___ F.3d ____, No. 98-1188, 2000 WL 345683 (10th Cir. Apr. 4, 2000) forecloses both of Fortune's arguments. Following cases such as Parke v. Raley, 506 U.S. 20, 28, 31, 34 (1992), Patterson v. New York, 432 U.S. 197, 207-08 (1977), and United States v. Wicks, 132 F.3d 383, 388-89 (7th Cir. 1997), we expressly held in Smith that "the burden shifting scheme found in § 3559(c)(3)(A) does not violate due process." 2000 WL 345683, at *2-*3. We also declined to reach the defendant's challenge to the "clear and convincing evidence" requirement of § 3559(c)(3)(A), because the defendant could not establish nonqualification "[u]nder any standard of proof." Id. at *3. We decline to reach Fortune's challenge to § 3559(c)(3)(A) in the instant case for the same reason. Here, the government established by at least a preponderance of the evidence that Fortune used or threatened to use a dangerous weapon during the commission of the crime charged in CRF-69-2665. The government made this affirmative showing of nonqualification by submitting the police report, the witness list, and a follow-up report. Consequently, Fortune's argument fails even if we assume the government (rather than Fortune) should bear the burden of proof. We therefore "affirm the district court while reserving judgment on the constitutionality of the 'clear and convincing evidence' provision of § 3559(c)(3)(A)." Mackovich, 2000 WL 485091, at *12; see also Smith, 2000 WL 345683, at *3 (citing United States v. Kaluna, 192 F.3d 1188, 1196-98 (9th

Cir. 1999) (en banc), <u>cert.</u> <u>denied</u>, 120 S. Ct. 1561 (2000) for a similar

proposition).

AFFIRMED.

Entered for the Court

Mary Beck Briscoe
Circuit Judge
