**F I L E D**
**United States Court of Appeals**
**Tenth Circuit**

**OCT 9 2002**

**PATRICK FISHER**
**Clerk**

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

UNITED STATES OF AMERICA,

  Plaintiff - Appellee,

v.

JACKIE CARL KNIGHT,

  Defendant - Appellant.

No. 02-6059
(D.C. No. CR-01-104-C)
(W.D. Oklahoma)

**ORDER AND JUDGMENT**[*]

Before **EBEL**, **LUCERO** and **HARTZ**, Circuit Judges.

Jackie Carl Knight ("Knight") appeals his convictions of bank robbery and brandishing a firearm during a robbery. He contends that the district court should have suppressed identification evidence offered by four eyewitnesses because the photographic lineup presented to the witnesses was impermissibly suggestive. We exercise jurisdiction pursuant to 28 U.S.C. § 1291 and AFFIRM the convictions.

---

[*]After examining the briefs and appellate record, this panel has determined unanimously to grant the parties' request for a decision on the briefs without oral argument. See Fed. R. App. P. 34(f) and 10th Cir. R. 34.1(G). The case is therefore ordered submitted without oral argument. This order and judgment is not binding precedent, except under the doctrines of law of the case, res judicata, and collateral estoppel. The court generally disfavors the citation of orders and judgments; nevertheless, an order and judgment may be cited under the terms and conditions of 10th Cir. R. 36.3.

On January 9, 2001, Commercial Federal Bank in Oklahoma City was robbed at gunpoint by two men. (ROA, Vol. 2 at 29-30; Vol. 3 at 65-66.) One man wore a ski mask, and the other wore a disguise consisting of a baseball cap, dark glasses and a fake or dyed beard. (Id., Vol. 2 at 30; Vol. 3 at 65-66.) The robbery, which lasted approximately one minute (Id., Vol. 2 at 42-43), was witnessed by several bank employees (Id., Vol. 3 at 65-66, 98-99; Vol. 4 at 152-55, 179-80) and recorded by the bank's surveillance cameras (Def.'s App. at 56-83).

The first robber's face was completely concealed by the ski mask, and the employees were only able to give descriptions of his physique. (ROA, Vol. 3 at 66, Vol. 4 at 161-62.) The other robber, who wore the disguise, moved around during the robbery, such that none of the employees could see his face for the entire minute. (ROA, Vol. 3 at 92, 129; Vol. 4 at 167-68, 189-90.) Immediately after the robbery, however, several employees described him and believed they could identify him. (Id., Vol. 2 at 16-17.) For approximately a month following the robbery, the FBI had no suspects in the case. (Id. at 6.)

In February 2001, the FBI was contacted by a Wyoming DEA agent who had received information relating to the bank robbery from a convict. (Id., Vol. 2 at 4-5; Vol. 4 at 198.) The convict, Walter Hei, reported that his fellow inmate, Knight, had admitted committing a robbery in Oklahoma City and had related

several details about the robbery.  (Id., Vol. 2 at 5-6; Vol. 4 at 198.)  After confirming that the details of Hei's story aligned with the facts of the Commercial Federal Bank robbery, FBI agent Cloyce Choney had police officers assemble a lineup of six photographs.  (Id., Vol. 2 at 6; Vol. 4 at 199-200.)  Knight's photograph was placed in the number 4 position.  (Id., Vol. 2 at 8-9.)  All of the individuals in the lineup were white males of approximately the same age with male pattern baldness and facial hair.  (Id. at 8; Def.'s App. at 84.)  All but one wore glasses.  (Def.'s App. at 84.)

Choney presented the lineup to four bank employees—Amanda Remy, Tricia Nelson, Sam Reid, and Jason Wilke.  (ROA, Vol. 2 at 9, 12, 16-18.)  All of these employees had earlier reported that they might be able to identify the disguised robber.  (Id., Vol. 2 at 17.)  Choney informed the employees that the lineup did include an FBI suspect (Id., Vol. 2 at 9, 19-20; Vol. 4 at 212), but that they should not identify any of the photographs unless they were "one hundred percent" certain about their choice (Id., Vol. 2 at 10, 12, 46; Vol. 3 at 72, 78; Vol. 4 at 158, 196.).  Remy, Reid, and Wilke did not recall whether they were told that a suspect was in the lineup.  (Id., Vol. 2 at 45, Vol. 3 at 77-78, 131; Vol. 4 at 196.)

Remy viewed the lineup first and identified Knight as the bank robber who wore the hat, glasses, and beard.  She noted her identification by writing her

initials on the back of Knight's photograph. (Id., Vol. 2 at 10-11, 26; Vol. 3 at 107.) Nelson viewed the lineup second. She also identified Knight and wrote her initials on the back of his photograph. (Id., Vol. 2 at 10-11, 26; Vol. 4 at 158-59.) Both Remy and Nelson identified Knight as the robber very quickly and expressed that they were certain about their selections. (Id., Vol. 2 at 10-12, 21, 23, 34; Vol. 3 at 107-08; Vol. 4 at 159.) Choney then took the lineup to another location to show to Reid and Wilke. (Id., Vol. 2 at 12.) Each tentatively selected Knight's photograph (number 4), but were not completely certain.[1] (Id., Vol. 2 at 12-13, 24-25; Vol. 3 at 78-79; Vol. 4 at 183-84, 204, 212.) Because they were not positive about their selections, Choney did not ask them to initial the back of the photographs. (Id., Vol. 2 at 13; Vol. 4 at 204-05, 208.)

All of the witnesses were shown the lineup separately, and none knew if another witness had selected one of the photographs until after their own selection. (Id., Vol. 2 at 11, 13, 22-23, 33; Vol. 3 at 72, 107; Vol. 4 at 157-58, 177.) Agent Choney did not say anything to suggest which of the photographs was the suspect. (Id., Vol. 4 at 202, 205.)

---

[1]The testimony as to whether Reid and Wilke ultimately settled on number 4 is unclear. Both Reid and Wilke testified at trial that they had identified number 4. (Id., Vol. 3 at 72; Vol. 4 at 183.) Agent Choney testified, however, that Reid and Wilke were indecisive between numbers 2 and 4. (Id., Vol. 4 at 204, 211.)

Prior to trial, Knight moved to suppress these out-of-court identifications and any in-court identifications that might be made by these witnesses. (Id., Vol. 1 at 14.) The district court denied the motion, concluding that there was "absolutely nothing about this photo array that is suggestive." (Id., Vol. 2 at 57.) At trial, the out-of-court identifications were admitted and all four employees made in-court identifications of Knight over his objections. (Id., Vol. 3 at 76, 109; Vol. 4 at 159-60, 185-85.)

Knight contends that the admission of the witnesses' in-court and out-of-court identifications violated his Fifth Amendment due process rights. We review the district court's factual findings for clear error and review the determination of whether the defendant's due process rights were violated by the admission of the evidence de novo. United States v. Sanchez, 24 F.3d 1259, 1262 (10th Cir. 1994).

To determine whether admission of a witness identification from a photographic lineup violates a defendant's due process rights, we apply a two-prong test. First, we ask whether the photographic lineup was impermissibly suggestive. United States v. Wiseman, 172 F.3d 1196, 1208 (10th Cir. 1999); United States v. Smith, 156 F.3d 1046, 1050 (10th Cir. 1998); Sanchez, 24 F.3d at 1261-62. Factors used to determine whether a photograph array is impermissibly suggestive include the size of the array, the manner of its presentation, and the details of the photographs. Smith, 156 F.3d at 1050. Second, if the lineup was

impermissibly suggestive, we ask whether the identification was nevertheless reliable considering the totality of the circumstances. Sanchez, 24 F.3d at 1262.

To determine whether a photographic lineup is impermissibly suggestive, we first consider the size of the array. In this photograph lineup, the witnesses were shown six photographs. The Tenth Circuit has held that "the number of photographs in an array is not itself a substantive factor, but instead is a factor that merely affects the *weight* given to other alleged problems or irregularities in an array." Sanchez, 72 F.3d at 1262. While there is no per se rule that a lineup with only six photos is unconstitutional, this number is "sufficiently small to weigh heavily in the balance of factors to be considered." Smith, 156 F.3d at 1050 (quoting Sanchez, 72 F.3d at 1263). Thus, we must look to other factors to see if the size of this lineup rendered it impermissibly suggestive.

The second factor we consider is the manner in which the lineup was presented to the witnesses. In this case, Knight argues that the manner of presentation was suggestive in several ways: 1) Agent Choney told the witnesses that a suspect was present in the lineup; 2) Agent Choney did not ascertain the level of certainty of the witnesses making the identification; and 3) Agent Choney

asked the witnesses who were certain about their identification to initial the back of the photograph.[2]

The evidence shows that the manner in which Agent Choney presented the lineup was not suggestive. Although he did tell the witnesses that a suspect was present in the lineup, three of the witnesses did not remember being given that information. Choney specifically instructed all of the witnesses that they were under no obligation to make an identification and that they should not make an identification unless they were one hundred percent certain. Furthermore, informing a witness that a suspect is present in a lineup is merely one factor to consider when deciding if a lineup is impermissibly suggestive and must be considered in conjunction with other factors. Grubbs v. Hannigan, 982 F.2d 1483, 1490 (10th Cir. 1993) (informing witness that suspect was present in six-person lineup was suggestive where four of the individuals in the lineup "had facial characteristics noticeably dissimilar from those of the appellant" and one individual had already been seen by the witness in a previous lineup). There is no evidence in this case that this information influenced the witnesses' identification of Knight.

-----

[2]Knight relies on a research report promulgated by the Department of Justice for the proposition that these aspects of Choney's conduct were improper. This report, Eyewitness Evidence: A Guide for Law Enforcement (U.S. Dep't of Justice ed., Oct. 1999), merely presents guidelines and is not binding on this court, as Knight concedes. (Aplt. Br. at 16.)

Choney's steps to ascertain the witnesses' degrees of certainty also indicates that the lineup was not suggestive. There was no need for Choney to interrogate Remy and Nelson, who did identify Knight conclusively, about their degrees of certainty because he had told them at the outset not to make an identification unless they were completely certain and because they showed no hesitation in selecting a photograph. Choney discussed with Reid and Wilke their levels of certainty and concluded that their identifications were not firm enough to record.

Finally, all of the witnesses viewed the lineup separately. Prior to making an identification, none of the witnesses knew if any other witness had made an identification or which photograph they had identified. Although Remy viewed the lineup first and put her initials on the back of Knight's photograph, no other witness saw those initials until after making his or her own selection. Choney made no statement to any of the witnesses regarding which photograph to pick or the need to make an identification.

Based on this evidence, we determine that the photographic lineup was not presented in a suggestive manner, and this factor weighs in favor of admitting the evidence.

The third factor we consider is the details of the photographs. This factor weighs heavily in favor of admitting the evidence. The lineup consisted of six

white men, all approximately the same age, all with white or grey facial hair, all balding, and most of whom are wearing glasses. There is nothing about any of these photographs that causes one or two to stand out from the rest. They are all the same size, with similar backgrounds, and similarly dressed suspects. No person who had not seen Knight could possibly select him as the suspect from among these remarkably similar photographs. See Wiseman, 172 F.3d at 1209 (admission of photographic lineup evidence was unconstitutional where defendant's photograph "shows [him] with very prominent dark circles under his eyes and with an extremely unnatural chalk-white pallor, while the skin tones in the photos of the other five persons in the array look quite natural"); Sanchez, 24 F.3d at 1263 (admission of photographic lineup evidence was constitutional even though there were "enough irregularities to raise some concern"); Grubbs, 982 F.2d at 1490 (admission of photographic lineup evidence was unconstitutional where four of the individuals "had facial characteristics noticeably dissimilar from those of the appellant" and one individual had already been seen by the witness in a previous lineup).

Knight argues that the photographs of number 2 and number 4 were so similar that the witnesses would have been prompted to choose one of those two. This argument is simply not supported by the lineup. All of the photographs in

this lineup are remarkably similar, and numbers 2 and 4 are no more similar than any of the others. As the district court stated,

> I've never seen a photographic array that I think is more fair than this one, that is less tainted, not suggestive in any way. It's not just 2 and 4 who look alike, but all six of these men look alike. In fact, I couldn't have picked out Mr. Knight from these six until I looked at him again and looked quite carefully from all six of them.

(ROA, Vol. 2 at 57.)

If a lineup consisted of two photos that dramatically resembled each other, and four photos that were completely different from those two, perhaps a witness would be prompted to choose one of the two that resembled each other. That is not the case here. Furthermore, two of the witnesses conclusively identified (and two tentatively identified) Knight despite the fact that the other lineup photos so closely resembled his. This bolsters the credibility of the identification, rather than diminishing it.

Although Appellant argues that the Eyewitness Evidence guidelines caution against "using fillers who . . . closely resemble the suspect," the purpose of this guideline is to avoid creating a situation where "a person familiar with the suspect might find it difficult to distinguish the suspect from the fillers." (Def.'s App. at 39.) Despite the resemblance of Knight to the other fillers, two eyewitnesses were nevertheless able to identify him with complete certainty.

Because we conclude that the photographic lineup was not impermissibly suggestive, we do not need to reach the second prong of the test—whether the identifications were nevertheless reliable. <u>Sanchez</u>, 24 F.3d at 1262 ("These two prongs must be analyzed separately, and it is only necessary to reach the second prong if the court first determines that the array was impermissibly suggestive.").

Admission of the out-of-court identifications in this case did not violate Knight's due process rights. When out-of-court identifications by witnesses are admissible, in-court identifications made by those same witnesses are also admissible. <u>Romero v. Tansy</u>, 46 F.3d 1024, 1032 (10th Cir. 1995).

For these reasons, we AFFIRM appellant's convictions.

ENTERED FOR THE COURT


David M. Ebel
Circuit Judge