**FILED**
**United States Court of Appeals**
**Tenth Circuit**

**August 21, 2009**

**Elisabeth A. Shumaker**
**Clerk of Court**

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

---

UNITED STATES OF AMERICA,

    Plaintiff - Appellee,

v.

HERBERT ISAAC PERKINS,

    Defendant - Appellant.

No.08-2069
(District of New Mexico)
(D.C. No. 1:07-CR-01010-JEC)

---

**ORDER AND JUDGMENT**[*]

---

Before **KELLY, HOLLOWAY** and **BRISCOE**, Circuit Judges.

---

Defendant-appellant Herbert Perkins was convicted at jury trial on four charges:

interfering with interstate commerce by threats or violence in violation of the Hobbs Act,

18 U.S.C. § 1951; two counts of discharging a firearm during and in relation to a crime of

violence in violation of 18 U.S.C. § 924(c); and one count of being a felon in possession

of ammunition in violation of 18 U.S.C. § 922(g).  He was sentenced to life imprisonment

on the Hobbs Act count (which was a mandatory sentence because of his prior

convictions); a 65-year term on the possession of ammunition count, to run concurrently

---

[*] This order and judgment is not binding precedent, except under the doctrines of law of the case, res judicata, and collateral estoppel.  It may be cited, however, for its persuasive value consistent with Fed. R. App. P.32.1 and 10th Cir. R. 32.1.

with the life sentence; and terms of 10 years and 25 years on the other two counts which were, as required by statute, imposed to run consecutively to all other sentences. He was also ordered to pay restitution of $583.00. Perkins now brings this direct appeal challenging his convictions on several grounds. Our jurisdiction is based on 28 U.S.C. § 1291.

I

*The background facts.*

This case arises from the nighttime armed robbery of a convenience store in Albuquerque, during which defendant shot the two employees who were present in spite of the fact that they had been cooperating. Fortunately, both victims survived. Defendant was accompanied by his nephew, Juan Castillo, who eventually entered into a plea agreement with the government and testified against defendant at trial.

Perkins and Castillo entered the store at about 4 a.m., entering from opposite sides. Each was armed. Adam Foucher saw Perkins first and apparently immediately suspected a robbery, probably because Perkins pulled a bandana over his face after entering. Foucher told Perkins that he could take anything he wanted. As Foucher was pointing out the keys to one of the two safes, Perkins shot him in the leg. The other clerk, Codie Abramson, likewise was helping the robbers get money from one of the safes when Perkins shot him in the stomach. Abramson nevertheless got $200 out of the safe and gave it to Perkins or Castillo. The robbers also got the money from the cash registers and several cartons of cigarettes.

-2-

Five of six motion-activated security cameras captured portions of the robbery. The store manager, who had been in route to the store when she heard of the robbery, reproduced these segments on a single disc and provided that disc to the police very quickly after the robbery. Still photographs were made from the disc and were distributed to television stations. Authorities received some information from the news coverage of the robbery and obtained an arrest warrant for Perkins, who was arrested the next day. Unopened cartons of cigarettes were found in a bag in the trunk of his car.

At the police station, Perkins waived his *Miranda* rights and tried to implicate Castillo. Perkins first denied that he was shown in the surveillance video. He later admitted that he had been at the scene. He then said that the robbery had not gone as planned because Castillo had gone "haywire," and that the plan had been for him, Perkins, to provide backup for Castillo. Perkins said that he shot the first clerk to calm Castillo down after Castillo went crazy and started firing his gun.

At trial, both of the employees present at the robbery identified Perkins as the robber who shot them. The surveillance videos were admitted in evidence. Apparently the digital images in these videos were quite clear. The government presented evidence of the statements made by Perkins after his arrest, as described in the previous paragraph. Also, Castillo testified about the robbery, and he also testified that Perkins had shot the two employees.

II

*Context of the motion to substitute counsel in the district court.*

-3-

The robbery occurred on July 31, 2006. Charges were first brought in state court. Several months later, in May 2007, Perkins and Castillo were indicted by a federal grand jury. It appears that plea negotiations were going on during the fall of 2007, but no agreement was reached. The prosecution then let defendant and the court know that negotiations were over and the case would go to trial.

On December 3, 2007, Perkins sent a letter to the court complaining that his lawyer had only met with him once since his appointment about six months earlier and asking that his lawyer be replaced. The letter also said that the lawyer had not provided Perkins with discovery and that Perkins's wife had obtained some of the discovery documents from the lawyer's office and given them to Perkins. "Worse yet," the letter said, "he has not filed a motion" and the case was scheduled for trial on December 11, 2007.

The government filed a response stating that Perkins's lawyer had met with or had telephone conversations with Perkins "closer to twelve times." These meetings had been in connection with the eventually unsuccessful plea negotiations. The prosecution, noting that a request for a continuance had been denied, suggested that Perkins had sent the letter and made the request for new counsel to delay the trial.

On December 5, 2007, the court held a hearing on Perkins's request for a new lawyer. The judge confronted Perkins with the government's statement that there had been substantially more than one meeting between Perkins and his counsel. The judge asked the lawyer how many times he had met with Perkins, and the attorney said "a good

-4-

number of times." Perkins said it was only "a couple of times." The judge pointed out the discrepancy: "Oh, now it's a couple of times?" Perkins said that the statement in the letter was a "clerical error" that was the fault of a fellow prisoner who had typed the letter, but added that in the previous month he had only seen the lawyer a couple of times.

The judge asked about communications with counsel. Perkins said that he had been able to communicate during the negotiations phase, but in the last couple of weeks he felt there had been a lack of communication. He said that the lawyer was not "building my case," that he was not "up to date to try my case," and that he had not been given a chance to view the surveillance video.

The attorney said that he had a copy of the video but that it was difficult to arrange for Perkins to view it while in jail. The lawyer also said that he had discussed with Perkins "all of that discovery." The lawyer expressed his willingness to go to trial and said that he was prepared and as able as anyone to try the case. On the other hand, he said that he was concerned that their relationship had deteriorated and believed that he might be unable to provide effective assistance if the relationship further deteriorated.

The prosecution opposed the suggestion of replacing counsel and suggested a one-month continuance to ensure that counsel and client had sufficient time together to prepare. The judge agreed and scheduled the trial for January 15, 2008. When that date came, the attorney informed the court that Perkins wanted another continuance.

The judge allowed Perkins to speak. Perkins said that the lawyer had not interviewed "any of my witnesses. He hasn't done anything that I want done toward this

case." He repeated an earlier statement that there was a conflict of interest between him and the lawyer. Perkins again referred to the lawyer's failure to file motions and said that "he don't have a defense for me."

The lawyer said that there had been a deterioration in the relationship with his client but assured the court that he would be ready to begin trial the next day. The court decided to select the jury and begin the trial the next day.

III

*Analysis of Perkins's request to replace counsel.*

Perkins now contends that his right to counsel was infringed by the trial judge's refusal to replace his lawyer. He asserts that he has met the standard set by our cases: To have his attorney replaced, an accused must show good cause such as a conflict of interest, a complete breakdown in communication, or an irreconcilable conflict which leads to an apparently unjust verdict. *United States v. Porter*, 405 F.3d 1136, 1140 (10th Cir. 2005).

Perkins asserts that there had been a total breakdown of communication and that the hearing held a month before trial demonstrated this. Mr. Perkins had lost confidence in Mr. Prichard. Prichard said, at the December hearing, that he should be replaced if the relationship deteriorated more, and at the time of trial, a month later, it was apparent that the relationship had gotten worse – there was no longer any working relationship at all.

Perkins maintains that the trial court's inquiry was merely cursory. The judge did not make a solid analysis of the relationship, he says, but jumped to the conclusion that

-6-

Perkins was abusing the system. With no basis at all the judge stated as a fact that Perkins would not be satisfied with any replacement counsel but "you'll want to get rid of the next attorney." The judge went on: "Look, buster, I've been up here for a long time. I've seen people like you day after day. And if you don't ever go to trial, you don't ever get convicted."

The error was not harmless, Perkins further contends. The transcript shows that Perkins complained throughout the trial of everything his lawyer did or did not do. Clear evidence that the relationship was broken was Perkins's interruption of the examination of one of the government's witnesses to announce to the entire courtroom that his lawyer hadn't done anything for him. Perkins now says that a mistrial should have been declared, although no motion was made. Moreover, he argues, prejudice is clear from his instruction to his lawyer at trial not to cross-examine his nephew and former co-defendant, Mr. Castillo, a key witness against him.

The government contends that the motive of the request to substitute counsel was to delay the trial and that the context of the request leads to this conclusion. Perkins faced a mandatory life sentence on conviction, and the evidence against him was overwhelming. There were videos of him committing the robbery, he had admitted being involved, and his co-defendant had agreed to testify against him. Both shooting victims identified Perkins at trial. There was no defense, the government contends.

Contrary to defendant's statements to the court, the government says, there were frequent contacts with his lawyer and no evidence of a severe conflict. Perkins complains

of the failure to interview witnesses and file motions, but even now does not explain what helpful motions could have been filed nor what witnesses could have testified for the defense. The attorney representing Perkins at trial did all that could be done in the case, which was only to put the government to its proof.

In analyzing the denial of a request to replace counsel, this court looks at "whether (1) the request was timely; (2) the trial court adequately inquired into defendant's reasons for making the request; (3) the defendant-attorney conflict was so great that it led to a total lack of communications precluding an adequate defense; and (4) the defendant substantially and unreasonably contributed to the communication breakdown." *Porter*, 405 F.3d at 1140. When a defendant asks for new counsel, the district court should make "formal inquiry" into the reasons for the request. *United States v. Lott*, 433 F.3d 718, 721 (10th Cir. 2006). We review the trial court's denial of the request under the abuse of discretion standard. *Id.* at 725.

Neither party has much to say about the timing of Perkins's request. Although the request was not made until a scheduled trial date was near, the request was ostensibly based on a recent deterioration in the attorney-client relationship. This factor is not of much weight under the circumstances of this case.

The trial court's inquiry was brief. But it quickly became apparent when the issue was first addressed that Perkins had been less than candid in his representations about the extent of contact with the lawyer. And the gist of the complaint – that the lawyer was failing to construct a defense – was muted by the apparent strength of the prosecution's

-8-

case and the vagueness of the complaint that the lawyer had failed to contact defense witnesses. Even now no attempt is made to describe who these supposed witnesses may have been or what testimony they might have been able to give. Also, the trial judge had the opportunity to observe and evaluate the defendant, and he probably also was familiar with defendant's lawyer. Therefore, we cannot conclude that defendant has shown that the inquiry was inadequate.

Most importantly, Perkins has not shown that there was a complete failure of communication. It is apparent that the relationship became strained. Yet it also seems apparent that the strain was at least in part a result of the extreme difficulty of defending against the government's compelling evidence. The trial judge apparently concluded that defendant's belief that his attorney was not making an adequate effort was feigned in a cynical attempt to delay the trial at almost any cost. If that were so, of course, it would completely nullify this argument. But even if we were to assume the defendant's complete good faith – an assumption we would be disinclined to make since it would be the equivalent of finding that the judge had made an erroneous finding of fact and require us to disregard his superior position for making that finding – the logical conclusion would be that defendant was unrealistically expecting his lawyer to be a conjurer, producing a theory of defense and witnesses to support it out of thin air.

Thus, even if we were to assume that the fourth factor (whether the defendant substantially and unreasonably contributed to the breakdown in communication) favored defendant, we would still be constrained to find no abuse of discretion in denying the

request for substitute counsel. Perkins has failed to substantiate his claim of a complete breakdown in communication. He has shown only that he was dissatisfied with his lawyer or with his circumstances, and that is not enough.

IV

*Analysis of the asserted cumulative effect of errors.*

In his second proposition, Perkins asserts that he was denied a fair trial because of the cumulative effect of a number of errors. The list of alleged errors is rather long: (1) the judge disparaged defendant's attorney in front of the jury; (2) counsel was not allowed to cross-examine a witness for bias; (3) Perkins was briefly removed from the courtroom; (4) the prosecution was allowed to introduce unreliable tool mark analysis about the bullet casings recovered at the scene; and (5) the prosecutor in closing argument improperly commented on defendant's failure to call witnesses on his behalf, vouched for the veracity of a key witness, and inflamed the jury by suggesting that defendant is dangerous.

*The judge's disparaging of counsel.*

The judge ridiculed trial counsel in front of the jury, Perkins asserts. In cross-examining one of the store's clerks about the surveillance videos, attorney Prichard asked: "You didn't describe the views or surveillance from each . . . of the six cameras, did you?" Instead of saying "no," the witness recounted his earlier testimony on direct that because the cameras are motion-activated, only five of the six had images from the time of the robbery. The attorney re-phrased the question and the witness answered,

-10-

"That's correct." At this point, the judge interjected: "He said it wasn't needed. Are you listening to the same stuff I'm listening to?"

This possibly intemperate remark by the trial judge was inconsequential. The only point counsel was trying to make – that one of the cameras showed nothing – was a feeble one, or at least if there was something more to be derived from the line of questioning it has yet to be explained.

Defense counsel had reason to believe, Perkins contends as explained further below, that one of the clerks had used methamphetamine. Perkins also wanted to challenge the clerk's identification of Perkins as one of the robbers. Counsel established that the clerk sees a large number of people every day at the store. The lawyer then asked, "Were you of sound mind and sober during the event there?" Answer: "That is correct." Next question: "And you're certain of that?" Answer: "I'm absolutely certain of that." The judge then interjected, in front of the jury: "Do you have any basis to ask that question?" The lawyer said, yes, "I want to know the quality of his testimony, your honor." The court said: "Well, not with that question. You've got to have something in your mind to back that up." The lawyer said that he was trying to get to that point and proceeded to ask about a drug debt, which led to the next alleged error.

*Curtailment of cross-examination for bias.*

Following the exchange about the clerk having been sober and of sound mind at the time, the defendant's trial attorney tried to ask the witness about a drug debt that the witness owed to defendant's niece, a question based on information the lawyer had

-11-

received in investigating the case.  The court abruptly blocked this effort to probe possible bias of the witness, Perkins now argues.  The attorney first asked the witness if he knew Andrea Delgado.  The witness said, "Not off the top of my head."  The lawyer then asked if the witness "owed some people some money about that time."  The prosecutor objected and the judge permitted a bench conference.

The prosecutor said that he didn't know where this was going but, based on the defense lawyer's earlier asking questions without a good faith basis, he requested a ruling on the "admissibility of whatever this Andrea Delgado line of questioning is."  The court asked the defense lawyer:  "So what if he's in debt to her?"  Attorney Prichard explained that he had information that the witness owed Delgado, who was defendant's niece, money for methamphetamine.  The judge said to stay away from that area because "there's no showing of methamphetamine here."  Explaining to the judge that the questioning was to bring out potential bias of the witness was unavailing.

Defense counsel should "ordinarily be given wide latitude when cross-examining a witness about credibility or bias."  *United States v. DeSoto*, 950 F.2d 626, 629 (10th Cir. 1991).  Here, it seems that the lawyer's cross-examination may have been stopped on lack of foundation for the questions before the foundation could have been laid.  However, assuming *arguendo* that there was error,  given the overwhelming evidence of guilt, any such error in curtailing this cross-examination was harmless beyond a reasonable doubt. *Chapman v. California*, 386 U.S 18, 21-24 (1967).  Of course evidence of identification of the defendant was crucial to the government's case.  But in addition to this store

-12-

employee's identification, there was that of the other store employee, plus the video evidence, plus the defendant's partial confession, plus the testimony of his accomplice and nephew.

*Removal of defendant from the courtroom.*

During the prosecution's direct examination of Mr. Abramson (the second of the two wounded store clerks) Perkins addressed the jury, complaining again about his lawyer's alleged lack of effort on his behalf. The judge told him that he would be removed if he didn't sit and be quiet. The judge rejected attorney Prichard's request for a bench conference. After a few more questions, Perkins interrupted again to say that he didn't want to be there. The judge asked the marshals, "He wants to be removed from the courtroom?" The marshals answered yes. The judge told Perkins to "Tell us when you want to come back." Perkins was removed and his lawyer's request for a bench conference was again denied.

The court then granted the prosecutor's request to make a record in front of the jury. The prosecutor suggested that the court make findings that the defendant had been warned but had continued to stand and speak and had insisted on being removed from the courtroom. The judge made the findings as suggested. Defendant returned to the courtroom about fifteen minutes later.

Perkins now contends that, although the trial judge may have acted in accord with the leading case of *Illinois v. Allen*, 397 U.S. 337 (1970), in removing him from the courtroom, the court should have permitted trial counsel to approach the bench to either

-13-

make a record or to suggest an alternative to removing Perkins from the courtroom. He claims that the judge's conduct was a violation of due process.

We find no abuse of discretion in the judge's handling of the situation. Defendant forced the judge to remove him from the courtroom. As far as the record shows this was done as discreetly as possible under the circumstances. Defendant's appellate brief provides no substance for his argument that the trial judge should have allowed a bench conference for counsel to make a record or to suggest an alternative to removing him from the courtroom. That is, there is no suggestion as to how the existing record is inadequate or what better record could have been made, nor is any suggestion made as to what alternatives were available to the trial court.

*Admission of tool mark analysis.*

Perkins asserts that the prosecution should not have been permitted to present expert testimony regarding marks observed on casings found at the scene of the robbery. He contends that the testimony failed to meet the standards set by *Daubert v. Merrill Dow Pharmaceuticals*, 509 U.S. 579 (1993).

A local police department employee, Mr. Stuart, was called to testify about his analysis of the bullet casings and fragments found at the scene. He testified, based on his analysis of the markings on the shells, that the five .45 caliber casings came from a single gun and that three other casings, from a 9 millimeter gun, also came from a single gun. Mr. Stuart has a bachelor's degree and substantial experience in examining tool marks, but he is not certified by the association of tool makers and has never had his competency

objectively assessed. He did not testify about his error rates, the error rates of his laboratory, or the error rates of his field generally. There was no objection to this testimony at trial, so review is only for plain error.

We find no plain error in the admission of this testimony. Because no objection was made at trial, there was no occasion for a *Daubert* analysis.

The argument on this point relies on a single case in which a federal court criticized firearm tool mark comparisons, *United States v. Green*, 405 F. Supp.2d 104 (D. Mass. 2005). The judge in that case decided to allow the expert to testify about his observations but did not permit him to testify about conclusions he drew from those observations. The case is not very helpful to Perkins because the court there emphasized that the "issue is not whether the field in general uses a reliable methodology, but the reliability of the expert's methodology *in the case at bar.*" 405 F.Supp.2d at 119 (emphasis in original). Because no challenge was made at trial to the admissibility of the testimony now challenged here, the record provides no basis for this court to review the reliability of this expert's methodology in this case. We therefore neither accept nor reject the analysis of *Green*, as we simply conclude that the issues considered in that case are not before us.

Moreover, this testimony was not of particular importance in this trial. Thus, even if we were to assume that the trial judge committed plain error in admitting the testimony – an assumption that we find unwarranted – we would still not find that the error was so prejudicial as to require reversal. Unlike *Green*, in which the expert testimony matched

-15-

the shell casings to a weapon connected with the defendant, in this case there was no weapon recovered. The expert testimony at issue here merely corroborated the evidence of the victims, the accomplice and the videotape. Without this tool mark evidence, the prosecution's case would still have been overwhelming.

*The prosecutor's comments in closing argument.*

Perkins complains of three comments, or sets of comments. First, the prosecutor talked about Mr. Castillo's testimony, commenting that of course Castillo knew his uncle, Perkins, well and wouldn't have misidentified him. And the prosecutor said that to believe otherwise, the jury would have to think that the robber looked just like Perkins, that Castillo decided to blame Perkins to save his own skin, and that he got an unbelievably lucky break when Perkins admitted involvement in the robbery before having been accused by Castillo (who evaded capture for some time). That notion is "bizarre and beyond belief," the prosecutor said, and the jury should conclude that Castillo was credible.

Perkins says that this argument by the prosecutor was improper vouching for the witness. It was not. It was proper comment on the evidence.

During his closing argument for Perkins, attorney Prichard had questioned why one of the investigating officers had not testified, as well as why none of the residents of the nearby apartments had testified. In rebuttal, the prosecutor told the jury that Mr. Perkins's lawyer had the same power to subpoena witnesses as the government.

Perkins now contends that this impermissibly shifted the burden of proof to him.

It did not. This was proper rebuttal to a remark that attorney Prichard had made in his closing. A police report had referred to three or four residents of the neighboring apartments as witnesses. Mr. Prichard asked, rhetorically, in his closing, where are they? Under these circumstances, the prosecutor's remarks were entirely proper and did not shift the burden of proof to the defense. Prosecutors have "considerable latitude" to respond to an argument of opposing counsel. *United States v. Herron*, 432 F.3d 1127, 1136 (10th Cir. 2005).

Finally, at the very end of his rebuttal, the prosecutor said that if in reviewing the evidence the jurors concluded that Perkins was guilty beyond a reasonable doubt, then they should vote to convict "and you will sleep just fine tonight." Perkins now claims that this was an improper suggestion that he was dangerous and an improper incitement for the jury to convict for their own personal safety.

Again, this was permissible rebuttal. Perkins's lawyer had suggested that the jurors might feel remorse if they returned a guilty verdict and later had regrets: "[S]ome of you might have thoughts about this: Did I do justice? . . . . And I suggest, ladies and gentlemen, that if you have doubts, if you have such concerns, you have them now, not later." The prosecutor's remark was permissible rebuttal in the circumstances. The prosecutor did not refer to physical danger, did not try to inflame the jury or arouse fear. He only said that *if* the jurors were convinced that the government had proven its case, they need not worry.

*Cumulative error.*

Cumulative error analysis "merely aggregates all the errors that individually have been found to be harmless, and therefore not reversible, and it analyzes whether their cumulative effect . . . is such that collectively they can no longer be determined to be harmless." *United States v. Rivera*, 900 F.2d 1462, 1470 (10th Cir. 1990) (en banc). The focus is on whether the defendant's substantial rights were affected. *Id.* In undertaking this analysis, we consider only actual errors, *id.*, and as discussed we have found no merit in most of the allegations of error in this case. As to the possible errors, we find in this case that Mr. Perkins's substantial rights were not affected. The alleged errors were harmless in combination as well as individually.

V

*The validity of the criminal statutes invoked.*

The last issue Perkins raises in this appeal is one that he characterizes as jurisdictional: His assertion is that "Congress lacks the authority to criminalize local crimes, such as robbery." Defendant-Appellant Herbert Isaac Perkins's Brief in Chief at 55-57. The government contests Perkins's right to raise this issue, suggesting it may have been waived, while recognizing that we review the issue *de novo* if it is in fact a jurisdictional matter. We agree that the issue has been framed as a jurisdictional one, but because the issue clearly has no merit, there is no point in a detailed discussion of the standard of review. We will apply the *de novo* standard.

Perkins cites the Tenth Amendment reservation to the states, or to the people, of powers not delegated by the Constitution to the federal government. He contends that the

federal statutes under which he was convicted exceed Congressional power under the Commerce Clause "insofar as conviction is allowed on the basis of a mere tendril of a **connection to interstate commerce." *Id.* at 56. There is no authority cited for the proposition. It is not even entirely clear whether the attack is on the Hobbs Act only, as references to robbery suggest, or also to 18 U.S.C. §§ 922 & 924, which is suggested when defendant refers in the plural to the statutes under which he was convicted.

In any event, there is no merit to the argument. These statutes have been upheld multiple times. We have upheld the constitutionality of the Hobbs Act in cases such as *United States v. Bolton*, 68 F.3d 396, 398 (10th Cir. 1995), and *United States v. Wiseman*, 172 F.3d 1196, 1214-17 (10th Cir. 1999), for example. The government showed at trial that the convenience store where this robbery occurred was closed for three days, and for several months thereafter closed at night instead of staying open 24 hours a day as it had before. This is more than sufficient to establish the "jurisdictional hook"[1] that the interstate commerce element provides for the Hobbs Act; indeed, it is the cumulative effect of robberies, not the effect of a single robbery, that satisfies the requirement, *Bolton*, 68 F.3d at 399. We have upheld the constitutionality of section 922(g) in *Bolton*, 68 F.3d at 400, and of section 924(c) in *United States v. Nguyen*, 155 F.3d 1219, 1226-27 (10th Cir. 1998).

Defendant's argument is without merit. The district court had jurisdiction in this

---

[1]*See Wiseman*, 172 F.3d at 1196 n.11.

-19-

case.

## Conclusion

The judgment of the district court is AFFIRMED.

Entered for the Court

William J. Holloway, Jr.
Circuit Judge